1996 SD 3

**Judd A. SPARAGON, Plaintiff and Appellant,**

v.

**NATIVE AMERICAN PUBLISHERS, INC., Defendant and Appellee.**

**No. 18897.**

Supreme Court of South Dakota.

Argued March 21, 1995.

Decided Jan. 10, 1996.

Mitchell C. LaFleur of LaFleur, LaFleur & LaFleur, Rapid City, for plaintiff and appellant.

Kenneth R. Dewell of Viken, Viken, Pechota, Leach & Dewell, Rapid City, for defendant and appellee.

SRSTKA, Circuit Judge.

[¶ 1] Judd A. Sparagon appeals from the granting of summary judgment in favor of Native American Publishers, Inc. We affirm, in part, reverse and remand, in part, and vacate and remand, in part.

## BACKGROUND AND PROCEDURAL HISTORY

[¶ 2] Hobart Lee (Lee), age 71, a diabetic and an Indian residing on the Pine Ridge Indian Reservation (Pine Ridge) lost his leg by amputation. The amputation started the chain of events leading to this suit.

[¶ 3] The Lakota Times (now known as Indian Country Today), a newspaper of general circulation that concentrates on issues relating to Indians, published an article concerning Lee's loss of his leg. In the article, Lee stated that Dr. Judd Sparagon (Sparagon) removed Lee's toenails causing them to bleed. Infection set in and amputation became necessary. The article was not true in many respects.

[¶ 4] Sparagon demanded that Native American Publishers, Inc. (N.A.P.), publisher of the newspaper, retract the article. N.A.P. refused and Sparagon sued for defamation. Discovery followed and N.A.P. moved for summary judgment.

[¶ 5] In the summary judgment motion, N.A.P. claimed a qualified privilege because a common interest in podiatric care existed and Sparagon could not show malice. The trial court held Sparagon was not a public official or figure, a common interest privilege existed, and Sparagon failed to meet his burden to show that N.A.P. published the article with malice. The court granted N.A.P. summary judgment. Sparagon appeals.

## FACTS

[¶ 6] On April 8, 1992, N.A.P.'s newspaper published an article, "Toenail Removal Costs Pine Ridge Man His Leg," written by its reporter, Pamela Stillman (Stillman). The article referred to Sparagon, the chief of podiatry at the United States Veterans Administration Medical Center in Hot Springs, South Dakota (VA Center). The VA Center has an agreement with the United States Indian Health Services (IHS) on Pine Ridge to provide treatment to the reservation Indian population at the Pine Ridge Clinic (Clinic).

[¶ 7] One week before publication of the article, Stillman contacted Delores Bruce (Bruce), the public affairs representative for the VA Center, telling Bruce she wanted information about Sparagon. Bruce informed Stillman that Lee was treated at Clinic and that generally diabetics' extremities are at extreme risk. Bruce furnished Stillman a news release in which Sparagon stated: "Thirty percent of the Indian people down there have diabetes and no access to podiatric care. We're all they have right now." Stillman requested further information, but Bruce stated she would release no further information without Lee's signed consent. Stillman stated she attempted to get a consent through Lee's attorney, Patrick Lee; however, she did not get such consent.

[¶ 8] The newspaper article stated Sparagon knew that patient Hobart Lee had diabetes and removed, at the Clinic, Lee's toenails of both big toes in December 1991, eventually causing the amputation of Lee's left leg. The amputation occurred on January 22, 1992.

[¶ 9] The true facts, however, were that Lee only had one toenail trimmed, not removed, and Sparagon did not perform the procedure. Lee incorrectly identified Sparagon as the attending physician and further incorrectly described the medical procedure to Stillman. The following is the article:

### Toenail removal costs Pine Ridge man his leg

By Pamela Stillman

Times Staff

RAPID CITY——When Hobart Lee, 71, of Pine Ridge had two ingrown toenails removed in December at the Pine Ridge Hospital, he never thought it would lead to the amputation of his left leg.

The leg was amputated Jan. 22 at Rapid City Regional Hospital, because of the toenail removal procedure, Mr. Lee said. He has retained an attorney to bring suit against the podiatrist who removed the toenails, Dr. Judd A. Sparagon.

Dr. Sparagon knew he was a diabetic, Mr. Lee said, but removed the toenails on each of his big toes by cutting them out which produced bleeding.

Both toes became infected, but the infection in the left foot spread, causing poor circulation in the leg and it had to be amputated below the knee, Mr. Lee said. His right foot also is infected, and he fears he may loose [sic] that leg too.

Dr. Sparagon regularly travels from the Veteran's Affairs Medical Center in Hot Springs to the podiatric clinic at the Pine Ridge Reservation Hospital, which he developed in 1989. Because of patient confidentiality he is unable to talk about Mr. Lee's case without a release from the patient. He said that Mr. Lee was examined and treated appropriately in outpatient clinics conducted in Pine Ridge through sharing agreements with Public Health Service.

(Mr. Lee's attorney advised against signing a release for Dr. Sparagon at this time.)

Dr. Sparagon is from New York and has worked for the Hot Springs VA hospital since 1982. In 1989, the doctor became one of fewer than 50 podiatrists board certified in public health.

Mr. Lee believes that there might have been a better way to remove the toenails.

"It just doesn't seem like the right way they should do it (remove toenails). Maybe that's the way podiatrists do it, but diabetics cannot take it. It shouldn't have bled that bad," he said.

In a recent article written for a national VA publication, Dr. Sparagon talked about the seriousness of diabetes on the reservation.

Asked what motivates him to keep going back, week after week, he grows very serious and tells you about the high incidence of diabetes on the reservation with the accompanying foot problems. "Thirty percent of the Indian people down there have diabetes and no access to podiatric care. We're all they have right now," the article said.

Mr. Lee is concerned that he is not the only one to have had an amputation because of the toenail removal process used, and he wants others to be aware of complications which could arise from this type of procedure.

"There are a lot of diabetics that I heard about this happening to, but they may not say anything."

Mr. Lee does not know what would have happened if he had not had the toenails removed.

"One doctor said it would have given me problems——but who knows? Who knows where I might have been in the next 10 years."

Mr. Lee's physician at the Pine Ridge Hospital, Dr. Allen Dobbs, said he knows about Mr. Lee's case, but cannot talk about it because of patient confidentiality. He did

say that diabetic patients can be at extreme risk with extremities, no matter what is done.

"There can be a problem even if it is a minor procedure. There could be a problem even if the procedure is not done.... I know that podiatrists have reversed dozens of amputations," Dr. Dobbs said.

Mr. Lee is in a local nursing home while his therapy continues.

[¶ 10] After publication on April 10, 1992, Sparagon demanded, by letter to Stillman, that N.A.P. retract the article. On April 14, 1992, N.A.P., through its owner Tim Giago (Giago), stated it would correct the false statements, but requested Sparagon to specify which parts were incorrect and why they were incorrect.

[¶ 11] Sparagon replied to Giago on April 27, 1995. Sparagon stated that the following statements were untrue: (1) the title; (2) the statement that Lee retained a lawyer to sue Sparagon who had removed Lee's toenails; (3) the statement that Sparagon knew Lee had diabetes and removed Lee's toenail causing bleeding; (4) the procedure caused infection of Lee's left foot, and the infection spread causing poor circulation; and (5) the statement that Sparagon believed that he treated and examined Lee approximately at the Clinic. Sparagon did not state why the statements were untrue, and never told N.A.P. he was not the treating physician.

[¶ 12] N.A.P.s publication published another article about Sparagon's request for retraction; however, it did not retract. Sparagon filed suit against N.A.P. claiming defamation. Sparagon claimed that the article was defamatory because it suggested he did something wrong by removing Lee's toenail that caused the leg to be amputated.

[¶ 13] N.A.P. investigated the Lee case after Sparagon sued. The investigation showed that Stillman, when preparing the article, interviewed Lee who told her that Sparagon removed his toenail and it became infected causing the amputation. Lee also stated that other persons had a similar problem.

[¶ 14] During discovery, Patrick Lee testified Stillman did not request consent to talk with Lee's physicians, and if he was asked,

he would not have recommended consent. Patrick Lee stated neither he nor Lee, his uncle, was told the nail removal caused the amputation, but he told Stillman that Lee was holding Sparagon liable for his condition. Patrick Lee did not want Stillman to publish the article since Patrick Lee did not want to try his case in the newspapers. Patrick Lee later amended Lee's claim against the federal government to remove the allegation that Sparagon was the attending physician.

## ANALYSIS

[¶ 15] In order to decide this appeal we must analyze the substantive and procedural rules respecting a libel claim.

[¶ 16] Libel cases have many pitfalls for the trial judge and practitioner. Over the course of years, the legislature and the courts have grafted unique procedural and substantive rules onto libel law. These rules substantially affect the prosecution of a libel case, particularly against a newspaper.

## REQUEST FOR RETRACTION

[¶ 17] SDCL 20–11–7 relates to a request for retraction. Before a plaintiff may bring a libel action against a newspaper or the publisher, editor or manager, the plaintiff:

[M]ust at least three days before the commencement of such action serve a notice on the person or persons against whom said action is to be brought specifying particularly the statement or statements claimed to be false and defamatory. If on the trial it appears that such statement or statements were written or published in good faith and with the belief founded upon reasonable grounds that the same were true, and a full and fair retraction of the erroneous matter correcting any and all misstatements of fact therein contained was published in the next issue of the paper, or in the case of a daily paper within three days after the mistake was brought to the attention of the publisher, editor, or manager in as conspicuous type as the original statement and the same position in the paper, the plaintiff will be entitled to recover no punitive damages.

SDCL 20–11–7. The trial judge must determine if plaintiff has fulfilled the requirements of this statute.

## PUBLIC OR PRIVATE FIGURE

[¶ 18] Next, the trial judge must determine if plaintiff is a public figure or official. (In this opinion, "public figure" includes a public official.) Here a modern libel case reaches a major fork in the road. If the plaintiff is a public figure, plaintiff faces a heavy burden to prove the claim.

[¶ 19] A public figure bringing a libel case faces a higher burden of proof than an ordinary civil litigant as a result of the "New York Times Rule." This rule "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964). The rule further requires that actual malice be shown with "convincing clarity," *Id.* 376 U.S. at 286, 84 S.Ct. at 729, 11 L.Ed.2d at 710, or, in a later formulation, by "clear and convincing proof." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974). This rule was later extended to libel suits brought by public figures. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

[¶ 20] An attempt to extend the "New York Times Rule" to private individuals occurred when the Supreme Court suggested that the rule should also reach private individuals involved in public concerns or general interests. *Rosenblatt v. Baer,* 383 U.S. 75, 97, 86 S.Ct. 669, 681, 15 L.Ed.2d 597 (1966). This opinion, however, was limited in *Gertz,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789. Writing for the majority, Justice Powell held the Supreme Court would not apply the "New York Times Rule" to private individuals. *Id.* at 346, 94 S.Ct. at 3010. Rather, so long as the states did not impose liability without fault, the states "may define for themselves the appropriate standard of liability for a publisher or broadcaster of defama-

tory falsehood injurious to a private individual." *Id.* at 347, 94 S.Ct. at 3010.

[¶ 21] We followed the "New York Times Rule" in *Janklow v. Viking Press,* 459 N.W.2d 415, 419 (S.D.1990). In that case we set forth guidelines that a public figure plaintiff in a libel suit must prove:

(1) libel by clear and convincing evidence;

(2) more than a defendant's failure to investigate;

(3) that the defendant entertained serious doubts as to the truth;

(4) that the defendant had a high degree of awareness of falsity; and

(5) that the defendant had obvious reason to doubt the veracity of the informant or the accuracy of his reports.

*Id.* at 420.

[¶ 22] Whether a person is a public figure in a libel action is a question of law for the trial court. *Nelson v. WEB Water Dev. Ass'n, Inc.,* 507 N.W.2d 691 (S.D.1993)(citing *Rosenblatt v. Baer,* 383 U.S. at 88, 86 S.Ct. at 677, 15 L.Ed.2d at 606).

[¶ 23] In *Gertz v. Robert Welch, Inc.,* the Supreme Court established a basis for determining if an individual is a public figure:

In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn in a particular public controversy and thereby becomes a public figure for a limited range of issues.

*Gertz,* 418 U.S. at 351, 94 S.Ct. at 3012, 41 L.Ed.2d at 812. Further, a person who has "substantial responsibility for or control over the conduct of governmental affairs" or has a position with "such apparent importance that the public has an independent interest in the qualifications and performances of the person who holds it, beyond the general public interest in the qualifications and performance of all governmental employees" may also be said to be a public figure or official as well. *See Rosenblatt,* 383 U.S. at 85–87, 86 S.Ct. at 676, 15 L.Ed.2d at 605–06.

## DEFINITION OF LIBEL

[¶ 24] Setting aside the issue of a summary judgment motion against a public figure's claim for a time, let us follow a private figure's claim for libel. The legislature has codified the definition of libel.

Libel is a false and unprivileged publication by writing ... which exposes [plaintiff] to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.

SDCL 20–11–3. The defense of privilege may be raised against the action, however.

## PRIVILEGE

[¶ 25] The trial judge must next examine if the communication is privileged. The legislature has codified and defined privilege in libel actions. A communication is privileged if made:

(1) In the proper discharge of an official duty;

(2) In any legislative or judicial proceeding, or in any other official proceeding authorized by law;

(3) In a communication, without malice, to a person interested therein, by one who is also interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information;

(4) By a fair and true report, without malice, of a judicial, legislative, or other public official proceeding or of anything said in the course thereof.

SDCL 20–11–5. Plaintiff must prove that communications were unprivileged. Subdivisions (1) and (2) are absolute defenses. *Hackworth v. Larson,* 83 S.D. 674, 165 N.W.2d 705 (1969); *Flugge v. Wagner,* 532 N.W.2d 419 (S.D.1995). Subdivisions (3) and (4) are conditional defenses and malice destroys them. *Peterson v. City of Mitchell,* 499 N.W.2d 911 (S.D.1993); *Tibke v. McDougall,* 479 N.W.2d 898, 905 (S.D.1992). The burden of proving malice that destroys the privilege is upon the plaintiff. *Id.* at 906.

## COMMON INTEREST

[¶ 26] The defense of common interest privilege, SDCL 20–11–5(3), often becomes a question in libel actions and occurs in this case. The existence of the privilege is a question for the Court and therefore is freely reviewable. *Peterson v. City of Mitchell,* 499 N.W.2d at 915.

[¶ 27] In determining if a published communication is a matter of common interest, the trial judge must determine if the communication is made to an interested person by an interested person or by a person who stands in relation to the interested person. SDCL 20–11–5(3). The inquiry is to ask whether, if true, "it is a matter of proper public interest in relation to that with which it is sought to associate it." *Peterson v. City of Mitchell,* 499 N.W.2d at 915 (quoting *McLean v. Merriman,* 42 S.D. 394, 399, 175 N.W. 878, 880 (1920)). We have recently quoted, with approval, the Restatement (Second) of Torts:

An occasion makes a publication conditionally privileged if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know.

*Tibke,* 479 N.W.2d at 905 (quoting Restatement (Second) of Torts § 596).

## MALICE

[¶ 28] A plaintiff may provide malice by showing defendant made a statement "with knowledge of its falsity or a reckless disregard for the truth." *Janklow v. Viking Press,* 459 N.W.2d at 419.

[¶ 29] The issue of whether actual malice exists is a question of law and freely reviewable. *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 685, 109 S.Ct. 2678, 2694, 105 L.Ed.2d 562 (1989)(the "question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law.")

## SUMMARY JUDGMENT

[¶ 30] This case and many modern cases respecting libel concern the granting of summary judgment. In 1986, the United States Supreme Court redefined the standard under which the courts must evaluate a summary judgment motion against a libel claim. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254–56, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). In *Liberty Lobby, Inc.,* the Court stated that when the trial court examines a summary judgment motion in a libel claim, it must "bear in mind the actual quantum and quality of proof necessary to support liability." *Id.* 477 U.S. at 254, 106 S.Ct. at 2513, 91 L.Ed.2d at 215.

[¶ 31] Before the trial judge may examine a summary judgment motion under SDCL 15–6–56(c) in a libel action, the judge must know the levels of proof for malice at the trial. In *Janklow v. Viking Press,* 459 N.W.2d at 419, we followed *Anderson v. Liberty Lobby,* stating a public figure must prove malice through clear and convincing evidence both at trial level and summary judgment level.

[¶ 32] We conclude, however, a preponderance of the evidence continues as the burden of proof for libel trials involving private persons, as it has been since territorial days in civil actions.

> When South Dakota became a state, it adopted the Civil Code and the Code of Civil Procedure of the State of California, which, of course, carried with it the conduct of jury cases in civil matters, including instructions to the jury.

> The so-called 'preponderance or weight of the evidence' rule has been adopted by the courts and used in this state since territorial days. It is approved and recommended by the California Jury Instructions, (6th Ed) (BAJI) 2.60. It is approved and adopted by the federal court in E. Devitt and C. Blackmar, Federal Jury Practice and Instructions, section 71.14 (3rd Ed 1977).

"Burden of Proof–Introduction" 21–00 (Revised 1989), *South Dakota Civil Pattern Jury Instructions.*

[¶ 33] We further conclude the established precedents for deciding summary judgment motions apply to libel actions involving private persons. Summary judgment is proper only when the moving party shows that the judgment is merited as a matter of law because there is no genuine issue of material fact. *First Western Bank v. Livestock Yards,* 444 N.W.2d 387 (S.D.1989); *Caneva v. Miners and Merchants Bank,* 335 N.W.2d 339 (S.D.1983). The burden of clearly showing no genuine issue of material fact exists falls on the moving party and reasonable doubts should be resolved against the moving party. *Mackintosh v. Carter,* 451 N.W.2d 285, 286 (S.D.1990); *Klatt v. Continental Ins. Co.* 409 N.W.2d 366 (S.D.1987). The facts must be viewed in a light most favorable to the nonmoving party. *Wilson v. Great Northern Ry.,* 83 S.D. 207, 157 N.W.2d 19 (1968). Finally, on appeal, affirmance of a summary judgment is proper if there exists any basis that would support the trial court's ruling. *Peterson v. City of Mitchell,* 499 N.W.2d at 911; *Mackintosh v. Carter.*

[¶ 34] Following the general analysis of libel claims, we proceed to this appeal's issues.

## ISSUES

I. Demand for retraction,

II. Public figure,

III. Summary judgment on the question of privilege, and

IV. Summary judgment on the question of malice.

## DECISION

[¶ 35] **I. Demand for retraction**

[¶ 36] N.A.P. argues that before Sparagon may commence a defamation claim, he must serve notice demanding a retraction and state with particularity which portions of the article were incorrect and why they were incorrect. N.A.P. claims Sparagon's letter demanding retraction did not comply with SDCL 20–11–7 because it did not say why such statements were false. The statutory retraction issue is one of first impression in South Dakota although the issue was raised

in the United States District Court for the District of South Dakota. *Janklow v. Newsweek,* 759 F.2d 644, 654 (8th Cir.1985).

[¶ 37] In that case, Newsweek claimed that plaintiff's action was barred because he failed to give the pre-action notice required by SDCL 20–11–7. The Court of Appeals for the Eighth Circuit decided that the issue should be decided, in the first instance, by the District Court on remand. In a footnote, the Court of Appeals noted that the question of whether SDCL 20–11–7 totally bars an action in the absence of the required notice was open; however, similarly worded statutes in other states only barred punitive damages, not the action itself, if the notice was not given. This opinion was later reversed by the Court of Appeals, en banc, and the District Court never made the determination. *Janklow v. Newsweek, Inc.,* 788 F.2d 1300 (8th Cir.1985).

[¶ 38] In statutes similar to SDCL 20–11–7, other courts have held that compliance with the notice statute is not a condition precedent to bringing a defamation action. *Estill v. Hearst Pub. Co.,* 186 F.2d 1017, 1021 (7th Cir.1951); *Meyerle v. Pioneer Pub. Co.,* 45 N.D. 568, 178 N.W. 792, 795 (1920); *Clementson v. Minnesota Tribune Co.,* 45 Minn. 303, 47 N.W. 781 (1891). Rather, the purpose of such statute is to allow the publisher an opportunity to limit his damages to actual damages. *Meyerle, supra; Clementson, supra. See also,* W.E. Shipley, Validity, Construction and Application of Statutes Limiting Damages Recoverable for Defamation, 13 ALR2d 277 § 6 (1960 & 1987 supp).

 [¶ 39] We adopt the rationale that the Minnesota court expressed in *Clementson:*

Taking the first clause of this act by itself, and construing it literally, it would seem to sustain defendant's contention that in every case, regardless of the character of the damages sought to be recovered, such a notice must be served before any suit can be brought for the publication of a libel in a newspaper. But it is a cardinal rule of construction that the whole statute must be taken and construed together. The intention of the legislature is the important thing to be ascertained, and, in order to arrive at this, we are to look at the object sought to be attained, as well as the means to be employed. And while it is no doubt true that if the language of a statute is plain and unambiguous, at least if its literal expression leads to no unjust or absurd consequences, there is no room for construction or interpretation, yet it is also true that where a close or literal construction of a loosely-worded enactment would lead to unreasonable or absurd consequences, and the act is also fairly susceptible of another construction, the latter is to be adopted, although not a literal but a liberal one.... Now it is evident that the sole purpose of this statute in requiring notice to be served before suit is to give the publishers of the paper an opportunity to publish a retraction; and the only effect of the retraction, if made, in case it appears on the trial that the article was published in good faith, and that its falsity was due to mistake or misapprehension of the facts, is to prevent the recovery of general damages, and limit it to actual damages. The retraction, if made, does not affect in the least the recovery of actual damages. So far as the right to recover such damages is concerned the service of the notice referred to would be a mere idle and useless ceremony which the legislature cannot be presumed to have contemplated or intended. Hence, notwithstanding the general language of the first clause of the statute, yet, as it is only the right to recover general damages which the legislature was seeking to limit, and as the service of notice or a consequent retraction can have no possible effect upon the recovery of actual damages, it should be held that the provision as to the service of notice has reference only to a claim for damages of the former class.

*Clementson,* 45 Minn. at 303, 47 N.W. at 781.

[¶ 40] We hold that SDCL 20–11–7 does not require a party to serve notice of retraction in order to bring action for actual damages stemming from libelous conduct.

 [¶ 41] Moreover, we note the demand that Sparagon served upon N.A.P. gave notice which sections of the article

Sparagon believed to be false and defamatory. Although N.A.P. contends Sparagon was required to state why such statements were false and defamatory, the statute does not require a plaintiff so to specify. Therefore, we conclude Sparagon performed his requirement under the statute.

### [¶ 42] II. Public figure

[¶ 43] The trial judge ruled Sparagon "was not a 'public official' as he did not have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." The judge further ruled Sparagon's "position would not invite scrutiny and discussion of the person holding it." N.A.P. does not contest the judge's ruling.

[¶ 44] Whether a person is a public figure for purposes of a libel action is a question of law for the trial court. *Nelson v. WEB Water Dev. Ass'n., Inc.*, 507 N.W.2d at 697. For purposes of a libel suit, a physician is ordinarily not considered a public figure. *Park v. Capital Cities Communications, Inc.*, 181 A.D.2d 192, 585 N.Y.S.2d 902, 905 (1992), *appeal dismissed* 80 N.Y.2d 1022, 592 N.Y.S.2d 668, 607 N.E.2d 815, and 81 N.Y.2d 879, 597 N.Y.S.2d 929, 613 N.E.2d 961. For example, a physician who treats a patient and has limited involvement with such patient is not a public figure. *Pesta v. CBS, Inc.*, 686 F.Supp. 166, 169–70 (E.D.Mich.1988).

[¶ 45] Physicians who hold themselves out to be "pioneers" or "champions" of new techniques and who affirmatively step outside of their private realms of practice to attract public attention by holding press conferences may, however, be public figures. *See Park*, 585 N.Y.S.2d 902. They may also be public figures if they actively or vigorously place themselves in public controversies concerning public health issues by writing, lecturing, and acting as experts in litigation and hearings. *See Exner v. American Medical Assoc.*, 12 Wash.App. 215, 529 P.2d 863, 868 (1974), review denied; *McBride v. Merrell Dow & Pharmaceuticals*, 800 F.2d 1208, 1211 (D.C.Cir. 1986). *See also*, Tracy A. Bateman, J.D., Who is "Public Figure" For Purposes of Defamation Action, 19 ALR5th 1, § 38 (1994).

[¶ 46] In the case before the Court, Sparagon did not hold himself out as a pioneer of new technology, hold press conferences, or voluntarily place himself in the middle of a present controversy. Further, he did not achieve fame, did not have substantial responsibility or control over governmental affairs, and did not have greater importance than a regular governmental employee. Rather, Sparagon had limited involvement with the injured patient and he was involuntarily thrust into unwanted publicity. We affirm the trial court on this issue.

### [¶ 47] III. Summary judgment on question of privilege

[¶ 48] The trial judge ruled that the facts entitled defendant to a qualified privilege under SDCL 20–11–5(3). The judge stated in his opinion,

> diabetic patients can be at high risk with their extremities. By his own statement Dr. Sparagon indicated that 'Thirty percent of the Indian people down there have diabetes and no access to podiatric care.' Dr. Sparagon provides vital services to persons living on the Pine Ridge Indian Reservation, especially diabetics, who rely on public health medicine. Therefore the subject of podiatric care on the reservation is of sufficient public importance to entitle Defendant to a qualified privilege in publishing the articles in question based upon the common interest provision in SDCL 20–11–5(3).

[¶ 49] Long established precedent exists in South Dakota that the privilege does not apply communications relating to professional conduct of physicians. *Rood v. Dutcher*, 23 S.D. 70, 120 N.W. 772 (1909). In his opinion the trial judge distinguished *Rood v. Dutcher*, stating that "plaintiff [in *Rood*] was a private physician and only persons who desired to employ him would be interested in communications relating to his professional conduct. Here recipients of public health services would have no choice on who would provide podiatric care." Unfortunately, the trial judge cites no authority

for this statement, and we find none that would override the authority of *Rood v. Dutcher*. South Dakota, a rural state, has many areas that have no access to podiatric care in contrast to Pine Ridge. Should the access or lack of access of physicians and whether they are privately paid or publicly funded make any difference in the law? Should patients and physicians in public facilities have fewer rights and privileges than their counterparts in the private sector? We think not.

[¶ 50] The issue of care is between patient and physician and not for public consumption.

> [O]nly such persons as desire to employ [the physician] are interested in communications relating to his professional conduct. Hence neither the proprietor of a newspaper nor any other person owes any duty to give information concerning the same unless requested to do so by someone desiring to employ the physician.

*Rood v. Dutcher*, 23 S.D. at 76, 120 N.W. at 774. Attorney Patrick Lee, Lee's representative did not want the alleged Sparagon medical procedure published. N.A.P. ignored Lee's request and published regardless.

[¶ 51] Undoubtedly diabetes on Pine Ridge is of great public interest. In the record before the trial judge, however, N.A.P. presented no evidence about the number of diabetics on Pine Ridge, the seriousness of the problem on Pine Ridge Reservation of diabetics (except for the press release), any history or problem about incidents at Pine Ridge respecting diabetics being treated by a podiatrist and having thereby lost an extremity as a result of the treatment, public concern about such treatment, or a public outcry against podiatrists.

[¶ 52] No public controversy existed with respect to the business in which Sparagon was engaged. (Contrast *Peterson*, 499 N.W.2d at 911, wherein the Court found there was apprehension of individuals in response to a recent waive of thefts and vandalism.) The only evidence presented to the trial judge regarding an interest in the subject matter was a copy of the articles in which the VA Center recognized that Indian people have diabetes and are without access to podiatric care and that Sparagon and the Clinic are "all they have right now." The remainder of the evidence to establish the common interest is speculation, and such evidence is not sufficient to establish a common interest. "Unsupported conclusions and speculative statements do not raise a genuine issue of fact." *Paradigm Hotel Mort. Fund v. Sioux Falls Hotel Co.*, 511 N.W.2d 567 (S.D.1994).

[¶ 53] The publication described the relationship between a doctor and a patient, and *Rood v. Dutcher*, places that relationship outside the privilege.

[¶ 54] We reverse the trial judge on this issue.

## [¶ 55] IV. Summary judgment on the question of malice

[¶ 56] Since we conclude that no privilege exists, we vacate the judgment respecting the issue of malice and remand for reconsideration under the facts and law of this case.

## CONCLUSION

[¶ 57] We affirm, in part, reverse and remand, in part, and vacate and remand in part for further proceedings consistent with this opinion.

[¶ 58] MILLER, C.J., and AMUNDSON, J., concur.

[¶ 59] SABERS, J., dissents.

[¶ 60] SRSTKA, Circuit Judge, for KONENKAMP, J., disqualified.

[¶ 61] GILBERTSON, J., not having been a member of the Court at the time this action was submitted did not participate.

SABERS, Justice (dissenting).

[¶ 62] I agree with the majority opinion that failure to demand a retraction under SDCL 20–11–7 precludes a claim for punitive damages.[1] But this was not a proper de-

---

1. An improper demand for retraction under SDCL 20–11–7 precludes punitive damages only

mand for retraction because the aggrieved party must "[specify] particularly the statement or statements claimed to be false and defamatory." Here, Dr. Sparagon, the aggrieved party, did not specify particularly the false statement. The false statement was that Dr. Sparagon was Lee's physician, and he was not. Therefore, Dr. Sparagon merely needed to inform defendant that he was not Lee's treating physician but he did not. Dr. Sparagon's technical and coy responses were evasive and more camouflage than compliance with SDCL 20–11–7. Therefore, his failure to comply in good faith with SDCL 20–11–7 upon defendant's offer to correct false statements should preclude his claim for punitive damages.

[¶ 63] I also dissent because defendant was clearly entitled to the qualified privilege under SDCL 20–11–5(3). This was "a communication, without malice, to a person interested therein, [its readers] by one who is also interested," in diabetes on an Indian reservation. SDCL 20–11–5(3). Even the majority opinion says, "[u]ndoubtedly, diabetes on Pine Ridge is of great public interest."

[¶ 64] This court stated a test for qualified privilege in *Peterson v. City of Mitchell*, 499 N.W.2d 911 (S.D.1993):

> An infallible test in determining whether a communication published under the particular circumstances is or is not privileged is to ask whether, if true, *it is a matter of proper public interest* in relation to that with which it is sought to associate it.

and does not affect general or special damages. The language of *Clementson* as quoted in the majority opinion refers to "general" damages but our statute does not.

2. This situation differs from *Rood v. Dutcher*, 23 S.D. 70, 120 N.W. 772 (1909), relied upon by the majority opinion.

 In *Rood*, this court stated:
 > Whether or not a newspaper article falsely reflecting on the professional skill or conduct of a person engaged in the practice of medicine is privileged depends on the relation of the physician, as such, to the public, not on his peculiar methods of soliciting business.

 *Rood*, 23 S.D. at 75, 120 N.W. at 773. The *Rood* court distinguished a physician from a public official and held that the definition of

*Peterson*, 499 N.W.2d at 915 (quoting *McLean v. Merriman*, 42 S.D. 394, 399, 175 N.W. 878, 880 (1920) (emphasis added in *Peterson*)). The *Peterson* court then concluded that the citizens of Mitchell had a common, public interest in apprehending criminals which led to application of a qualified privilege. *Id.* at 916.

[¶ 65] Dr. Sparagon stated, in a national Veterans Administration publication, that thirty percent of the Indian people on the reservation have diabetes and that foot problems accompany diabetes. Clearly, then, the residents of the Pine Ridge reservation had a "common, public interest" in the issue of diabetes and podiatric care which entitled defendant to a qualified privilege in printing the story. *See Peterson*, 499 N.W.2d at 916.[2]

[¶ 66] These facts entitle defendant to a qualified privilege under SDCL 20–11–5(3). Therefore, this matter should be tried to the jury, on proper instructions, based on qualified privilege as there is a genuine issue of material fact as to malice, i.e., whether the false statement was made "with knowledge of its falsity or a reckless disregard for the truth." *Janklow v. Viking Press*, 459 N.W.2d 415, 419 (S.D.1990) (citing *Harte-Hanks, Communications, Inc. v. Connaughton*, 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989)).

"privileged communication" did not include newspaper articles relating to the professional conduct of physicians, because "only such persons as desire to employ [the doctor] are interested in communications relating to his professional conduct." *Id.*, 120 N.W. at 774.

However, the trial court found the subject of podiatric care on the reservation "of sufficient public importance" to extend a qualified privilege to defendant. I agree. The trial court correctly distinguished *Rood* because diabetics on the reservation rely on public health medicine and, "recipients of public health services would have no choice on who would provide their podiatric care." The common, public interest in the high rate of diabetes and its accompanying foot problems among residents of the Reservation indicates that many persons would be "interested in communications relating to" the disease and its effects.