#23679-a-JKM

**2006 SD 44**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

JIM SCHWAIGER, M.D.,                     Plaintiff and Appellant,

    v.

AVERA QUEEN OF PEACE HEALTH
SERVICES,                                Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
DAVISON COUNTY, SOUTH DAKOTA

* * * *

HONORABLE ROBERT A. AMUNDSON
Justice (Retired), sitting as a circuit court judge

* * * *

ROBERT A. CHRISTENSON of
Christenson Law Office, PC
Sioux Falls, South Dakota

JONATHAN K. VAN PATTEN                    Attorneys for plaintiff
Vermillion, South Dakota                 and appellant.

MICHAEL F. TOBIN
MICHAEL S. McKNIGHT of
Boyce, Greenfield, Pashby & Welk, LLP     Attorneys for defendant
Sioux Falls, South Dakota                 and appellee.

* * * *

ARGUED ON MARCH 22, 2006

OPINION FILED **05/03/06**

#23679

MEIERHENRY, Justice.

[¶1.] Dr. Jim Schwaiger (Schwaiger) brought this suit against Avera Queen of Peace Hospital (Avera) for negligence, defamation, breach of contract, and misrepresentation. The trial court granted summary judgment on all of Schwaiger's claims. He appeals the judgment on the defamation and breach of contract claims. We affirm.

## FACTS

[¶2.] On April 27, 1998, Jim Schwaiger began a one-year employment contract with Mitchell Radiological Associates, P.C., (MRA) in Mitchell, South Dakota. While employed at MRA, Schwaiger had medical staff privileges at Avera, the hospital in Mitchell, and performed radiological services there pursuant to a contract between MRA and Avera. Allegations of inappropriate behavior by Schwaiger arose during the summer and fall of 1998. According to those allegations, Schwaiger made inappropriate comments to both staff and patients at Avera while performing radiological services.

[¶3.] Information concerning the allegations against Schwaiger was transmitted in a December 28, 1998 e-mail from Rod Kernes (Kernes), the director of Avera's radiology department, to K.C. DeBoer (DeBoer), Avera's Vice President of Professional Services. DeBoer then restated those allegations in a letter to Schwaiger's employer, MRA, on December 29, 1998. The letter was addressed to Dr. Carey Buhler (Buhler), a partner at MRA; Buhler also acted as the medical director of Avera's radiology department. DeBoer wrote:

> I have now discussed with you on two occasions concerns being brought forward by employees related to the behavior of Jim

-1-

> Schwaiger, M.D., an employee of [MRA].  I regret the need to involve you in this situation, but since Dr. Schwaiger is an employee of your company, I feel it would be most appropriate for you to address these issues with him consistent with your contractual obligation as the President of [MRA].

The letter then detailed eight examples of alleged inappropriate behavior by Schwaiger.[1]  Three of the reported incidents involved Avera patients.  Of all the allegations, the seventh was the most serious allegation in the letter.  It involved Schwaiger's behavior toward and comments concerning a male patient being prepped for an angiogram.  The letter described the alleged incident as follows:

> In August or September, a young male patient was being prepped for an angiogram.  Dr. Schwaiger entered the control room area.  He proceeded to inquire about the patient's physical attributes.  He made comments about the patient being "a young, good looking, blonde boy."  He entered the exam room and palpated the patient's femoral artery.  Dr. Schwaiger was not the physician involved in the case.

A note at the top of DeBoer's letter indicated that it was "FOR DR. BUHLER'S EYES ONLY," however, the bottom of the letter shows copies were sent to three administrators at Avera.

---

1.  In its memorandum decision, the trial court stated that DeBoer's letter "described nine specific incidents of behaviors and/or comments that staff had reported as making them uncomfortable."  Citing the letter as appended to Schwaiger's brief, Avera, in its brief, also stated that the letter detailed "nine separate instances of conduct."  At oral argument, however, Schwaiger's attorney stated that he "counted eight" allegations in the letter.  Upon an examination of the letter, we agree that it contained eight allegations:  the "screwdriver" incident, the "new technology" incident, several "miss you" incidents which were addressed as one allegation, the "elevator eyes" incident, the "fat butt" incident, the "thyroids like breasts" incident, the "blonde boy" incident, and the "impotence" incident.

[¶4.]     Shortly after receiving DeBoer's letter, Buhler and his partner at MRA, Dr. Kundel, met privately with Schwaiger to discuss some of the incidents described in the letter. The "blonde boy" incident, however, was not discussed at the meeting. After the meeting, Kundel privately informed Schwaiger about the "blonde boy" allegation. Schwaiger then confronted Buhler and vigorously denied the allegation. A few days later, Buhler wrote a follow-up letter to Schwaiger detailing their meeting; Buhler wrote a similar letter to DeBoer. Thereafter, Avera received no further reports concerning questionable conduct by Schwaiger, and Avera took no disciplinary or personnel action against Schwaiger. Schwaiger continued to work at MRA and Avera until the completion of his contract.

[¶5.]     Schwaiger brought this suit against Avera and originally asserted claims of negligence, defamation, and tortious interference. He then amended his complaint so as to eliminate the claim of tortious interference and added claims of breach of contract and misrepresentation. Avera moved for summary judgment, and the trial court ruled in Avera's favor on all of Schwaiger's claims.

[¶6.]     Schwaiger appeals the adverse ruling on his claims of defamation and breach of contract. Schwaiger claims that DeBoer's letter—specifically, the details of the alleged "blonde boy" incident—constitutes a defamatory communication. Schwaiger admits that the letter is a communication between interested parties, but he argues that the qualified privilege applicable to such communications does not apply because the allegation was malicious. Schwaiger also alleges that Avera breached its contract with Schwaiger by failing to follow procedure established by the medical staff bylaws when investigating the alleged "blonde boy" incident.

According to Schwaiger, the trial court erred in granting summary judgment for Avera, and he asks us to consider the following issues:

## ISSUES

1. Whether the trial court erred in concluding that there was no genuine issue of material fact regarding the existence of malice, which would negate the qualified privilege defense to defamation for communications between interested persons.

2. Whether the trial court erred in concluding that there was no genuine issue of material fact as to whether Avera breached the medical staff bylaws.

## STANDARD OF REVIEW

[¶7.] Our review of a trial court's decision on summary judgment is well established:

> Summary judgment is authorized if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. We will affirm only when there are no genuine issues of material fact and the legal questions have been correctly decided. All reasonable inferences drawn from the facts must be viewed in favor of the non-moving party. The burden is on the moving party to clearly show an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law. Summary judgment will be affirmed if there exists *any* basis which would support the trial court's ruling.

Cleveland v. BDL Enters., Inc., 2003 SD 54, ¶11, 663 NW2d 212, 216-17 (citations and quotation marks omitted) (emphasis in original). The non-moving party, however, cannot merely rest on its pleadings; it must point to specific facts which establish a genuine, material issue for trial. Wulf v. Senst, 2003 SD 105, ¶18, 669 NW2d 135, 141-42. Mere allegations are not sufficient to avoid summary judgment. *Id.* ¶18, 669 NW2d at 142.

**DECISION**

*Defamation*

[¶8.]        We first review Schwaiger's contention that genuine issues of material

fact precluded summary judgment on his defamation claim.  In South Dakota,

defamation is defined by statute.  SDCL 20-11-2.  Defamation includes both libel[2]

and slander.[3]  SDCL 20-11-2.  By definition, both libel and slander are

"unprivileged" communications.  SDCL 20-11-3; SDCL 20-11-4.  Therefore, a

defamation action may not survive if the alleged defamatory communication was

---

2.     Libel is defined as

>        [A] false and unprivileged publication by writing, printing,
>        picture, effigy, or other fixed representation to the eye which
>        exposes a person to hatred, contempt, ridicule, or obloquy, or
>        which causes him to be shunned or avoided, or which has a
>        tendency to injure him in his occupation.

SDCL 20-11-3.

3.     Slander is defined as

>        [A] false and unprivileged publication, other than libel, which:
>        (1)    Charges any person with crime, or with having been
>               indicted, convicted, or punished for crime;
>        (2)    Imputes to him the present existence of an
>               infectious, contagious, or loathsome disease;
>        (3)    Tends directly to injure him in respect to his office,
>               profession, trade, or business, either by imputing to
>               him general disqualification in those respects which
>               the office or other occupation peculiarly requires, or
>               by imputing something with reference to his office,
>               profession, trade, or business that has a natural
>               tendency to lessen its profit;
>        (4)    Imputes to him impotence or want of chastity; or
>        (5)    By natural consequence, causes actual damage.

SDCL 20-11-4.

privileged. Peterson v. City of Mitchell, 499 NW2d 911, 915 (SD 1993). The existence of privilege is a question of law. Sparagon v. Native Am. Publishers, Inc., 1996 SD 3, ¶26, 542 NW2d 125, 132.

[¶9.] What constitutes a privileged communication is set forth by statute. SDCL 20-11-5. If a communication is made "*without malice*, to a person interested therein, by one who is also interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information," it is privileged. SDCL 20-11-5 (emphasis added). Consequently, communications between interested parties are protected unless those communications are made with malice.

[¶10.] In this case, Schwaiger bases his defamation claim on DeBoer's letter to Buhler concerning Schwaiger's conduct. Schwaiger admits that the letter is a communication between interested parties, but he contends that the qualified privilege applicable to such communications does not apply because of the existence of malice. However, malice cannot be inferred from the defamatory communication alone. SDCL 20-11-5. Rather, Schwaiger must present evidence that the communication was made with "reckless disregard of the truth or actual malice." Kieser v. Se. Props., 1997 SD 87, ¶15, 566 NW2d 833, 837-38. The test for whether DeBoer's communication is reckless depends on whether he had "serious doubts" about its truthfulness at the time he sent the letter. *Id.* ¶15, 566 NW2d at 838. As we have stated,

> The real test of whether a defendant's conduct is reckless so as
> to constitute actual malice is whether he in fact entertained

> serious doubts as to the truth of his publications. Reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.

Petersen v. Dacy, 1996 SD 72, ¶8, 550 NW2d 91, 93 (citations and quotation marks omitted); *see also Kieser*, 1997 SD 87, ¶21, 566 NW2d at 839 ("Kiesers have offered no proof that Southeast Properties did not believe, at the time it communicated the allegations, that Kiesers stole the listed property."); *Petersen*, 1996 SD 72, ¶14, 550 NW2d at 94 ("Petersen has offered no proof that Cerny did not believe, at the time she made the communication to the four Mr. G's employees, that Petersen stole the tickets.") "Because malice cannot be presumed, the party bearing the burden of proof must establish that there was a reckless disregard for the truth on the part of the accused," and "a specific showing of malice is required for purposes of raising a genuine issue of material fact." Tibke v. McDougall, 479 NW2d 898, 905-06 (SD 1992).

[¶11.] In his complaint, Schwaiger alleged that DeBoer's letter was defamatory because Avera "knew or should have known that there was no factual basis for any inappropriate behavior by [Schwaiger] towards any patients of [Avera]." The trial court determined, however, that Schwaiger failed to "present evidence that [Avera] actually had serious doubts about the truth of the statements" in DeBoer's letter. The court noted that while Schwaiger questioned the source of the information in the letter, Avera "filed an affidavit from the employee who made the allegations" concerning the "blonde boy" incident. The court also noted that in any event, "a failure to investigate is not malice."

[¶12.] On appeal, Schwaiger focuses on the statement concerning the "blonde boy" incident because it is "the most outrageous and the most damaging." For evidence of malice, Schwaiger asserts that "one need not look any further than Rod Kernes." Schwaiger argues that DeBoer's letter was instigated by Kernes, with whom Schwaiger had a strained relationship. According to Schwaiger, Kernes composed the e-mail in retaliation after Schwaiger reported to Kernes' superiors that Kernes had a drug problem. Schwaiger claims that Kernes' animosity toward him prompted Kernes' e-mail to DeBoer which, in turn, prompted DeBoer to repeat the allegations in the letter to MRA. Schwaiger asserts that his history with Kernes supports the inference that the statement regarding the "blonde boy" incident was made with malice. Schwaiger also contends the time lapse between the actual occurrence of the "blonde boy" incident in May 1998 and Kernes' e-mail months later also supported an inference of malice. In response, Avera argues that Schwaiger inappropriately relies on the allegation of a strained relationship between Kernes and Schwaiger for the first time on appeal and had presented no evidence to the trial court making it a genuine issue of material fact.

[¶13.] The record does not contain an affidavit or a deposition of Kernes,[4] and the trial court's decision never mentions Kernes or his relationship with Schwaiger. The only evidence that Kernes may have had a malicious motive in transmitting the

---

4. Interestingly, Schwaiger recognized the importance of Kernes' testimony not only in his affidavit, *infra* n5, but also during DeBoer's deposition when the following exchange occurred:

> Q (by Schwaiger's attorney): Did you feel in your capacity in your job that you had a duty to find out who made these allegations?
>
> (continued . . .)

-8-

#23679

allegations about Schwaiger in his e-mail to DeBoer came from Schwaiger's

affidavit.[5]  Schwaiger cannot point to any other evidence of animosity.  He only

_____

(. . . continued)

> A:    Rod and I would have discussed it, but I don't recall the details
>        of those discussions at this time.
>
> Q:    So we probably should talk to Mr. Kernes about that?  I mean
>        you don't know—you can recall if Mr. Kernes mentioned any
>        names to you, is that correct?
>
> A:    At this point, no.

DeBoer's deposition took place on December 20, 2003, but Kernes was not deposed before the summary judgment hearing in September 2004.

5.    Specifically, Schwaiger refers to three paragraphs in his affidavit in opposition to Avera's motion for summary judgment.  In whole, those paragraphs provide:

> 71.    Rod Kernes had substantial reason to dislike or fear me,
>        and be predisposed to act against me, since I had conveyed
>        [a nurse]'s allegation of I.V. drug abuse by Rod Kernes,
>        inside the hospital, to Dr. Buhler.  During the year I spent
>        in the hospital, Rod Kernes was accused on multiple
>        occasions of I.V. drug abuse, inside the hospital, by reliable
>        witnesses.  I have also been informed that, prior to my
>        arrival, Rod Kernes was accused of another case of I.V.
>        drug abuse, inside the hospital, by yet another reliable
>        witness.  Also, in a separate instance, Rod Kernes
>        reportedly consumed huge amounts of Demerol (an opiate)
>        as well as other opiates, over a two week period (I have
>        written documentation of this allegation).  While his office
>        was being cleaned after Rod Kernes' termination from the
>        hospital, yet another reliable witness noted a tourniquet
>        hidden (taped) underneath Rod Kernes' desk in his office.
>        Rod Kernes had every reason to be concerned about my
>        disapproval of his drug abuse inside the hospital, and this
>        quite probably gave him a source of malice in his actions
>        against me.  I ask that a jury be allowed to decide whether
>        his damaging and false statements against me are a
>        product of that malice, or whether they are, as [Avera]

(continued . . .)

-9-

#23679

surmises that Kernes had reason "to fear or dislike" him. He speculates that "Rod Kernes had every reason to be concerned about my disapproval of his drug abuse inside the hospital, and this quite probably gave him a source of malice in his actions against me." He further speculates in his affidavit that "Kernes also may have disliked and borne malice toward me because of my disapproval of his interference in patient care issues." Speculation and innuendo, however, are not enough to raise a genuine issue of material fact. As Schwaiger points out as part of his affidavit:

_____

(. . . continued)

would have us believe, part of his effort to protect my reputation through "collegial intervention."

72. In addition to my disapproval of I.V. drug abuse, Rod Kernes also may have disliked and borne malice toward me because of my disapproval of his interference in patient care issues. As I stated in my deposition, Rod Kernes attempted to impair the department's delivery of quality care to patients on multiple occasions, and I opposed his efforts. I leave it to a jury to decide as a question of fact, after hearing his testimony, whether he had malice toward me. I ask that a jury be allowed to decide whether his damaging and false statements against me are a product of that malice, or whether they are, as [Avera] would have us believe, part of his effort to protect my reputation through "collegial intervention."

73. Rod Kernes' malice toward me is evident in his practice of investigating my sex life and sexual preference, inside the hospital, during working hours, long after I left the hospital. I wrote of this practice to Ron Jacobsen in my letter AQOP 0089 on June 23, 2000, in which I was asking about damage to my reputation. A few weeks later, Rod Kernes was terminated. We need to learn more from Rod Kernes in his deposition about whether this was part of "collegial intervention," or whether it might be, as I believe, an indication of his zealous malice continuing perhaps to this very day.

> We need to learn more from Rod Kernes in his deposition about whether this was part of "collegial intervention," or whether it might be, as I believe, an indication of his zealous malice continuing perhaps to this very day.

Consequently, Schwaiger's affidavit concerning Kernes' motives in sending the e-mail does not set forth sufficient evidence to defeat the summary judgment motion.

[¶14.]      Even if we were to find the affidavit was sufficient to raise a genuine issue of material fact concerning Kernes' motive, it is not Kernes' e-mail which forms the basis of Schwaiger's claim of defamation. Rather, Schwaiger challenges DeBoer's letter, which incorporated Kernes' e-mail. We might assume that Kernes' e-mail was written maliciously, but even so, Schwaiger failed to provide compelling authority for the proposition that his malice can be imputed to DeBoer.[6] We have continually noted that "[a]s a threshold . . . [an appellant] must cite relevant authority before this Court will consider granting relief." State v. Corey, 2001 SD 53, ¶19, 624 NW2d 841, 845. Therefore, we determine only whether, when viewed in a light most favorable to Schwaiger, there is any evidence in the record to suggest that DeBoer entertained serious doubts as to the truth of his statement regarding the "blonde boy" incident when he wrote the letter to Schwaiger's employer.

---

6.      Citing two law review articles, Schwaiger argues that "support for the proposition that a publication with malice doesn't lose its malicious character when repeated may be found in the compelled or self defamation cases where an applicant for employment is forced to repeat the defamatory reason that he or she left the last job." He provides no further explanation for that statement. Further, the cited articles concern compelled self-publication, a doctrine this Court has not yet addressed, and they do not address whether malice can be imputed to one who publishes statements made by another.

[¶15.] In his deposition, DeBoer testified that the "blonde boy" incident was brought to his attention by Kernes. DeBoer did not specifically recall who made the allegation, and when asked if Kernes provided that information, DeBoer replied, "As I stated, probably in our conversation we discussed that, but at this time I don't recall the details." When asked whether the statement in his letter concerning the incident was "an accurate statement from what Mr. Kernes brought to [DeBoer]," DeBoer replied, "I believe that's true."

[¶16.] In his deposition, Rod Jacobsen (Jacobsen), then president of Avera, also testified regarding the source of the allegations concerning Schwaiger from DeBoer. When asked how he first learned of the allegations, Jacobsen stated, "My recollection is that [DeBoer] talked with me and said that employees have raised some issues, have had some complaints. He may have given me a couple of examples of the complaints that employees had given to, I believe, Rod Kernes. If I'm not mistaken, Rod Kernes talked to [DeBoer]. [DeBoer] told me about it." When asked if he recalled what DeBoer stated, Jacobsen replied, "No, not necessarily in specific, just that he referenced the fact that complaints have been made by employees to Rod Kernes concerning Dr. Schwaiger." Jacobsen did not know who made the allegation concerning the "blonde boy" incident.

[¶17.] The record also includes the deposition and affidavit of Stacy Koch (Koch), as well as the deposition of Mandy Robinson (Robinson), the two radiological technicians who observed the "blonde boy" incident. Both technicians stated that on May 7, 1998, they were preparing for an angiogram on a young man when Schwaiger made comments about the patient's physical appearance. According to

both Koch and Robinson, the patient was not a patient of Schwaiger. Koch observed Schwaiger palpate the patient's femoral artery. In her deposition and her affidavit, Koch stated that she reported the incident to Kernes.

[¶18.] Suffice it to say, DeBoer was not the most cooperative witness during his deposition. He was often evasive—"I don't understand your point"—and his memory was anything but clear where Schwaiger was concerned—"We're five years later. I don't recall those kind of details." Therefore, if the record provided no factual basis for the "blonde boy" allegation, we might question whether DeBoer published that allegation with reckless disregard for the truth. Even viewed in a light most favorable to Schwaiger, however, the only inference supported by the evidence is that Koch and Robinson observed conduct by Schwaiger which made them feel uncomfortable, Koch reported that conduct to Kernes, Kernes informed DeBoer of the conduct, DeBoer discussed his concerns with Jacobsen, and DeBoer passed his knowledge on to Buhler. We do not measure DeBoer's conduct "by whether a reasonably prudent man would have published, or would have investigated before publishing." *Petersen*, 1996 SD 72, ¶8, 550 NW2d at 93 (citations and quotation marks omitted). Therefore, because there is no evidence in the record that DeBoer in fact entertained serious doubts as to the truth of his publications, there is no genuine issue of material fact concerning malice. Thus, the trial court correctly entered summary judgment in favor of Avera on Schwaiger's claim of defamation.

*Breach of Contract*

[¶19.]      Next we review Schwaiger's argument that a genuine issue of material fact precluded summary judgment on his breach of contract claim.  As we have recognized, a hospital's bylaws constitute a binding contract between the hospital and its medical staff.  Mahan v. Avera St. Luke's, 2001 SD 9, ¶15, 621 NW2d 150, 154.  When the construction of hospital bylaws is at issue, "we apply the normal principles for construction and interpretation of a contract."  *Id.* (citation omitted).  The construction of a contract is a question of law which we review de novo.  *Id.* (citation omitted).

[¶20.]      Schwaiger asks us to consider two sections in Article III of Avera's medical staff bylaws.  The first section is Section VII, titled "Corrective Review Action."  Section VII states an investigation may be initiated whenever a physician "engages in, makes, or exhibits acts, statements, demeanor, or professional conduct . . . detrimental to patient safety or delivery of patient care, disruptive to the hospital operation or an impairment of the community confidence in the hospital."[7]

---

7.      Section VII provides:

> Corrective Review Action – Whenever a physician, dentist, or allied health professional with clinical privileges engages in, makes, or exhibits acts, statements, demeanor, or professional conduct (either within or outside of the hospital) detrimental to patient safety or delivery of quality patient care or disruptive to the hospital operations or an impairment of the community's confidence in the hospital, a review action against the individual may be initiated by the Chief Executive Officer, the Governing Board, the Executive Committee, or any officer of the Medical Staff.  If an adverse recommendation is made the affected individual may utilize the fair hearing plan in Article III, Section VIII.

#23679

The second section is Section X, entitled "Impaired Staff Membership," which provides the procedure that "shall be used in assisting Medical Staff member experiencing impairment of professional performance or disruption of hospital activity due to mental/emotional disturbances, sexual misconduct, physical disabilities and chemical impairment or dependencies."[8]

---

8.    Section X provides:

> Impaired Staff Membership – The following shall be used in assisting Medical Staff members experiencing impairment of professional performance or disruption of hospital activity due to mental/emotional disturbances, sexual misconduct, physical disabilities and chemical impairment or dependencies.
>
> PURPOSE:
>
> To provide a 1) confidential way of investigating alleged impairment or misconduct and, if appropriate, to achieve a confidential, fair and impartial assessment of a physician or professional's impairment or misconduct and 2) to assist the affected individual in initiating and continuing appropriate treatment for his/her condition and 3) to provide the Executive Committee with the information necessary to initiate corrective action if appropriate.
>
> POLICY:
>
> The Executive Committee shall assess any and all instances of purported impairment or disruption in a manner at once confidential, humanitarian, and directed toward assisting the affected individual while also assuring patient safety and the smooth operation of the hospital.

The section then goes on to provide the investigative procedure applicable to instances of "impaired staff membership."

-15-

[¶21.]     The parties disagree on the application of these sections to the allegations against Schwaiger.[9]  According to Schwaiger, Avera should have followed Section X's confidential investigation procedures, and its failure to do so constitutes breach of contract.  Specifically, Schwaiger focuses on the "blonde boy" incident, which, according to Schwaiger, constitutes an allegation of sexual misconduct under Section X.  Avera, however, argues that Section X does not apply because Schwaiger was not impaired and did not disrupt hospital activity.  According to Avera, Schwaiger's conduct made employees feel uncomfortable, and therefore it had discretion to engage in "collegial intervention," rather than a formal investigation process.

[¶22.]     We begin by noting the title of Section X, "Impaired Staff Membership."  The plain, ordinary meaning of "impaired" is "diminish[ed] in strength, value, quantity, or quality."  American Heritage Dictionary 644 (2d College Ed).  Thus, the title of Section X implicates more than just offensive conduct.  Section X goes on to require "impairment of professional performance or disruption of hospital activity."  The plain, ordinary meaning of "disrupt" is "[t]o throw into confusion or disorder."  American Heritage Dictionary 408 (2d College Ed).  Additionally, Section X requires that the source of impairment be "mental/emotional disturbances, sexual misconduct, physical disabilities and chemical impairment or dependencies."  While "sexual misconduct" is not defined by

---

9.     While it does not bear on the breach of contract issue, the fact that Avera took no disciplinary action against Schwaiger is notable.  Schwaiger's privileges were not restricted at any time, and therefore no review hearing took place.

the section, the surrounding terms—mental or emotional disturbances, physical disabilities, chemical impairment—indicate the serious connotation given to the terms. Therefore, Section X applies to serious impairments which diminish a physician's ability to provide care or cause confusion or disorder in hospital activity.

[¶23.] In this case, no evidence suggests that Schwaiger's staff membership was impaired in any way. The claims against Schwaiger alleged that he made inappropriate statements—most of a sexual nature—to hospital employees and patients. The "blonde boy" incident involved a similar comment to hospital employees. It also alleged that Schwaiger "entered the exam room and palpated the patient's femoral artery" and that Schwaiger "was not the physician involved in the case." Therefore, it is not apparent that the allegations claimed that Schwaiger was unable to fully perform his professional duties, or that Schwaiger's conduct caused confusion or disorder in hospital activity. Thus, we agree with the trial court that Section X's mandatory investigation requirement did not apply to the allegations against Schwaiger. Thus, Avera did not breach its contract with Schwaiger by failing to follow the procedure in Section X.

[¶24.] Even if the allegations against Schwaiger fell within Section VII, no breach of contract occurred. The language of Section VII allows investigation, but does not require it. Rather, Section VII granted Avera the discretion to apply its investigation procedure. Thus, we cannot say that Avera breached its contract with Schwaiger by utilizing "collegial intervention," rather than formal discipline procedures, to address the allegations regarding Schwaiger's conduct.

[¶25.] Affirmed.

[¶26.]        GILBERTSON, Chief Justice, and KONENKAMP and ZINTER,

Justices, and STEELE, Circuit Judge, concur.

[¶27.]        STEELE, Circuit Judge, sitting for SABERS, Justice, disqualified.