1999 SD 120

**PAINT BRUSH CORPORATION, Parts Brush Division, Plaintiff and Appellant,**

v.

**John NEU, James Neu, and Neu Realty Company, d/b/a Walton Brush, Defendants and Appellees.**

Nos. 20701, 20715, 20716, 20755, 20760, 20766.

Supreme Court of South Dakota.

Argued April 28, 1999.

Decided Sept. 1, 1999.

Martin Weeks of Bogue, Weeks, Collier & Reed, Vermillion, South Dakota, Raymond C. Ortman, Jr. of Ortman & Associates, Deephaven, Minnesota, John Simko and William G. Beck of Woods, Fuller, Shultz & Smith, Sioux Falls, South Dakota, Attorneys for plaintiff and appellant.

Cheryle Wiedmeier Gering and Michael J. Schaffer of Davenport, Evans, Hurwitz & Smith, Sioux Falls, South Dakota, Attorneys for appellees John Neu & Neu Realty.

David A. Pfeifle and Lon J. Kouri of May, Johnson, Doyle & Becker, Sioux Falls, South Dakota, Attorneys for appellee James Neu.

JOHNSON, Circuit Judge.

[¶ 1.] Paint Brush Corporation, Parts Brush Division, filed suit against James Neu, John Neu, and Neu Realty Company d/b/a Walton Brush, alleging: 1) violation of the South Dakota Uniform Trade Secrets Act; 2) fraud; 3) breach of duty of loyalty; and 4) breach of contract. John Neu, and Neu Realty Company d/b/a Walton Brush, (Walton Brush), filed a separate answer and counterclaim asserting defamation, disparagement, and tortious interference with business relationships or expectancy. Without providing any rationale as to its decision, the trial court granted summary judgment on all claims. We affirm, in part, and reverse and remand, in part.

## FACTS AND PROCEDURAL HISTORY

[¶ 2.] Paint Brush Corporation (PBC) was founded in 1946, by Douglas Rose, who is the president and principal shareholder of PBC. The business, located in Vermillion, designs, manufactures, and distributes paint brushes and parts cleaning brushes. It is the manufacturing process of the parts brushes and their customer and supplier lists that PBC claims are a trade secret.

[¶ 3.] In the second half of 1994, James Neu approached Rose and the two began discussions concerning the potential sale of PBC. James was interested in locating a business to provide his son, John Neu, with a stable and profitable future.

[¶ 4.] According to Rose, the parties continued negotiations and Rose furnished James with some of PBC's financial information. Rose also asserts the parties reached an agreement as to price and an approximate date of sale. He further claims the parties discussed the potential pre-sale employment of John, as James wished for his son to learn the business prior to taking over since the sale was not to commence until the spring of 1995.

[¶ 5.] Apparently in December 1994, James Neu decided he was no longer interested in purchasing the business. He did not, however, convey that to Rose. In January 1995, PBC hired John as its bookkeeper. John was employed there until June 30, 1995, when he was terminated for unacceptable performance and after Rose learned that James no longer planned on buying PBC.

[¶ 6.] In July 1995, after John's termination, Walton Brush was organized by John and James Neu to compete with PBC in the manufacturing of parts cleaning brushes. During the six-month period John worked at PBC, James purchased some equipment similar to that used by PBC in its manufacturing process of the parts brushes. Before John left PBC's employ, either Neu Realty or James made contact with some of PBC's suppliers and had received correspondence in return. PBC avers James received this information from John while he was still employed with them.

[¶ 7.] Rose learned about Walton Brush's parts brushes operation when one of PBC's customers forwarded an advertisement to PBC that they had received from Walton Brush. In response, PBC sent a "Warning" letter to its customers.[1] This letter is the basis of Walton Brush's counterclaims.

[¶ 8.] In February 1997, PBC brought an action seeking money damages and an injunction to prevent Neus from using or disclosing confidential information and trade secrets belonging to PBC. Walton Brush counterclaimed, asserting defamation, disparagement, and tortious interference with business relationships or expectancy. PBC and Neus moved for summary judgment. The trial court granted their motions, stating only that no genuine issues of material fact exist. Both parties appeal.

## ISSUES

[¶ 9.] PBC appeals, raising the following issues:

Did the trial court err in granting summary judgment and dismissing PBC's trade secret claim?

Did the trial court err in granting summary judgment and dismissing PBC's fraud claim?

Did the trial court err in granting summary judgment and dismissing PBC's breach of duty of loyalty claim?

Did the trial court err in granting summary judgment and dismissing PBC's breach of contract claim?

[¶ 10.] Walton Brush filed notice of review, raising the following issues:

Did the trial court err in granting summary judgment and dismissing Walton Brush's defamation claim?

Did the trial court err in granting summary judgment and dismissing Walton Brush's disparagement claim?

Did the trial court err in granting summary judgment and dismissing Walton Brush's claim of tortious interference with business relationships or expectancy?

Whether the trial court erred by failing to rule on, and then dismissing Walton Brush's Motion to Compel Discovery?

---

1. Following is the body of the letter:

 **WARNING**

 In 1969 Paint Brush Corporation decided to create a brush that would overcome all the shortcomings of existing parts cleaning brushes. The Atlasta and Oriflo brushes resulted from that decision. The handle was designed to stay in the hand of the user, and until recently provided instant recognition of the product to millions of users throughout the world.

 Yesterday we received an offering sheet under the name of Walton Brush of Yankton, South Dakota. The brushes shown appear to be of our manufacture, and their copy is lifted from our advertising material going back to the very beginning. You may think you are being offered our brushes by a re- seller at a price lower than you are paying us. Such is not the case.

 Walton Brush is not and never has been our customer. In our opinion what they are doing is flagrantly deceptive. There are no filaments in the marketplace superior to those we use. While we do not know what filaments are being used in the Walton brushes, there are filaments that, to the uninitiated, look like what we use but fall short on performance and useful life. All are lower in cost, which could account for Walton's lower prices.

 We suggest that you adhere to the time-tested adage. "LET THE BUYER BEWARE."

 As always, we appreciate your business.

[¶ 11.] James Neu and Walton Brush filed notice of review, raising the following issue:

Whether the trial court erred in denying Neus' motion for attorney's fees and taxation of costs and disbursements?

## STANDARD OF REVIEW

[¶ 12.] Our review of a trial court's order granting summary judgment is well established:

In reviewing a grant or a denial of summary judgment under SDCL 15–6–56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper.

*Coffee Cup Fuel Stops & Convenience Stores, Inc., v. Donnelly et al.,* 1999 SD 46, 17, 592 N.W.2d 924 (citing *Walther v. KPKA Meadowlands Ltd. Partnership,* 1998 SD 78, 14, 581 N.W.2d 527, 531).

## ANALYSIS AND DECISION

[¶ 13.] **The trial court erred in granting summary judgment to the Neus on PBC's trade secret claim.**

[¶ 14.] SDCL 37–29–1(4) sets forth the definition of what constitutes a trade secret. It provides as follows:

(4) "Trade secret," information, including a formula, pattern, compilation, program, device, method, technique or process, that:

(i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

The existence of a trade secret is a mixed question of law and fact. *Weins v. Sporleder,* 1997 SD 111, 16, 569 N.W.2d 16. "The legal part of the question is whether the information in question could constitute a trade secret under the first part of the definition of trade secret." *Id.* (citation omitted). Our question on review is whether or not what PBC claims to be a trade secret consists of "information, including a formula, pattern, compilation, program, device, method, technique or process" that could constitute a trade secret. SDCL 37–29–1(4). The factual part of the question is determined, however, from a review of the remaining statutory provisions found in the subdivisions of SDCL 37–29–1(4). *Id.*

[¶ 15.] We consider questions of law under a de novo standard of review. *Moss v. Guttormson,* 1996 SD 76, ¶ 10, 551 N.W.2d 14, 17. "Accordingly, the issues are fully reviewable and we afford no deference to the conclusions reached by the trial court." *Kent v. Lyon,* 1996 SD 131, ¶ 15, 555 N.W.2d 106, 110. The trial court's extremely brief memorandum opinion made no mention of a conclusion regarding any questions of law, it merely stated there were no genuine issues of material fact. We are left to determine the question of law as to whether a trade secret could exist under these facts.

[¶ 16.] Neus argue the parts brushes could simply be duplicated by viewing and by dissection, and, as a result, cannot be a trade secret. Rose disputes this and argues the process utilized by PBC to manufacture the parts brushes is not readily apparent by taking the brushes

apart.[2] PBC claims the trial court erred in granting summary judgment. It argues Neus could not have duplicated the parts cleaning brushes without some other knowledge of the manufacturing process. PBC claims that process could constitute a trade secret under the legal analysis of SDCL 37-29-1(4). We agree.

[¶ 17.] Viewing the facts most favorably to the nonmoving party, PBC, requires us to accept as true the process outlined within Rose's affidavit. "Until defendants gained access to plaintiff's secrets through John Neu's employment with the company, plaintiff's parts cleaning brush had never been duplicated." (Rose Affidavit, p. 7). The process or method described in Mr. Rose's affidavit, which we must accept as true under summary judgment review, fits the definition of what could constitute a trade secret. The *ring gauge* (designed by Rose) is used to measure the necessary bulk or volume of filaments for each brush head to ensure a proper fit within the ferrule. Use of this ring gauge is unique within the industry as others use weight to measure the amount of filaments to use. The means of forming the *dome-shaped brush head* (designed by Rose) by using tapered filaments of equal length consists of, inter alia, a block with a concave recess (carved by Rose) to match the desired shape of the brush head. This block is mounted on a paper-jogger which vibrates the filaments into place within the concave recess. This, too, is unique in the industry, along with the use of the rubber band to maintain the desired shape and configu-

ration. The use and method of removal of the *removable hollow plastic tube* to allow cleaning solutions to flow through the brush when connected to a hose are included in the process Rose described as secret and unique in the industry.

[¶ 18.] Walton Brush argues PBC had no trade secrets in their parts brush manufacturing process, yet they required all of their own employees to sign a document entitled "Employment Agreement (Trade Secrets and Restrictive Covenant)." This document lists fifteen areas in which Walton Brush claims certain trade secrets and confidential information exist in their brush-making business. Walton Brush's confidentiality agreement also included an exhaustive clause concerning all information dealing with the company.[3]

[¶ 19.] When viewing the evidence in the record in a light most favorably to PBC, we conclude as a matter of law that what PBC claims to be a trade secret does constitute the same under SDCL 37-29-1(4). Numerous genuine issues of material fact exist as to whether or not the factual part of the statutory trade secret definition, SDCL 37-29-1(4)(i) & (ii), could be satisfied, and that we leave to the jury.

[¶ 20.] **The trial court erred in granting summary judgment to the Neus on PBC's fraud claim.**

[¶ 21.] PBC's complaint labeled this claim as fraud but pled facts that are synonymous with the tort of deceit under South Dakota's statutory scheme. "One who willfully deceives another, with intent

---

**2.** For example, taking the brushes apart would tell the examiner *nothing* about how the filaments were measured for the ferrule (i.e. ring gauge versus weighing), *nothing* about the use of a paper jogger to align the filaments properly ([Rose does] not sell the paper joggers along with the brushes), *nothing* about the use of a rubber band to hold the filaments in place while the brush head is formed, *nothing* about the use of a concave cup [carved by Rose] to align the filaments into a dome-shaped head (as opposed to cutting the filaments to give the brush head a domed shape [cutting is what the rest of the industry does according to Rose]), and *noth-*

*ing* about the use of a plastic tube with weighted tip to form the recess through which cleaning solvent flows (the tube and tip are removed from the brush during the manufacturing process).

**3.** The parties further agree that in addition to the documents and information listed above, all information concerning Walton Brush or any element thereof, or any information affecting or relating to the business of the Company, is a trade secret and confidential information.

to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." SDCL 20–10–1. Deceit is defined in SDCL 20–10–2, as:

A deceit within the meaning of § 20–10–1 is either:

(1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

(2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

(3) The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

(4) A promise made without any intention of performing.

■ [¶ 22.] "[A]llegations of fraud and deceit without specific material facts to substantiate them will not prevent summary judgment." *Stene v. State Farm Mutual Automobile Insurance Co.*, 1998 SD 95, 26, 583 N.W.2d 399, 404 (quoting *Taggart v. Ford Motor Credit Co.*, 462 N.W.2d 493, 498 (S.D.1990)); *Western Cas. & Sur. Co. v. Gridley*, 362 N.W.2d 100, 102 (S.D.1985).

■ [¶ 23.] The essential elements of fraud are:

[T]hat a representation was made as a statement of fact, which was untrue and *known to be untrue by the party making it, or else recklessly made*; that it was made *with intent to deceive* and for the purpose of inducing the other party to act upon it; and that he [or she] did in fact rely on it and was induced thereby to act to his [or her] injury or damage.

*Stene*, 1998 SD 95, 27, 583 N.W.2d at 404 (citing *Dahl· v. Sittner*, 474 N.W.2d 897, 900 (S.D.1991) (emphasis original); *Holy Cross Parish v. Huether*, 308 N.W.2d 575 (S.D.1981)).

[¶ 24.] The trial court held that no genuine issues of material fact exist as to the claim of deceit asserted by PBC against the Neus and granted summary judgment. PBC claims the trial court erred in its determination. PBC argues Neus made misrepresentations of fact to Rose regarding their willingness to purchase PBC, knowing those representations were false and in an effort to compete with PBC; and, therefore, Walton Brush should not have been granted summary judgment on their fraud or deceit claim. We agree.

[¶ 25.] We must again consider the facts in the record in a light most favorably to PBC as the nonmoving party. According to Rose, he disclosed confidential information to James Neu while the parties were negotiating for the sale of his business. Rose further asserts at James' request he allowed John Neu to work at PBC to learn the business. It could reasonably be interpreted from these facts that defendants engaged in trickery to learn the paint/parts brush business and deceived Rose as a part of their well-contrived plan.

■ [¶ 26.] Walton Brush has urged this Court to affirm the trial court's summary judgment ruling on this claim because of a provision within the South Dakota Uniform Trade Secret Act (SDUTSA) which states that the act displaces certain remedies. Although deceit is a tort action, it is not displaced by the SDUTSA because it is not a "conflicting tort" remedy for the misappropriation of a trade secret. This act does not effect "other civil remedies that are not based upon misappropriation of a trade secret." [4] SDCL 37–29–7(b)(2).

4. SDCL 37–29–7. Effect on other law.
 (a) Except as provided in subsection (b), this chapter displaces conflicting tort, restitutionary and other law of this state providing civil remedies for misappropriation of a trade secret.

 (b) This chapter does not affect:
 (1) Contractual remedies, whether or not based upon misappropriation of a trade secret;

**392**

It is clear that deceit is not a civil remedy which is based upon the misappropriation of a trade secret. This claim could have been brought independent of any other claims in this action.

[¶ 27.] In other words, the alleged deceptive conduct could have taken place whether or not a trade secret was being misappropriated. "Questions of fraud and deceit are generally questions of fact and as such they are to be determined by a jury; furthermore, whether a party relied on the alleged fraud to its detriment is a fact question for the jury." *Dede v. Rushmore Nat. Life Ins. Co.*, 470 N.W.2d 256, 259 (S.D.1991) (citing *McKinney v. Pioneer Life Ins. Co.*, 465 N.W.2d 192 (S.D. 1991); *Laber v. Koch*, 383 N.W.2d 490 (S.D.1986); *Commercial Credit Equipment Corp. v. Johnson*, 87 S.D. 411, 209 N.W.2d 548 (1973)).

[¶ 28.] After a thorough review of the evidence, viewed in a light most favorably to PBC, one could determine that Rose was fraudulently induced to hire John, share financial information, or enter into the alleged purchase agreement based upon his assertions and supporting affidavits. Thus, we hold that specific material facts and genuine issues of material fact exist which preclude summary judgment in this case.

[¶ 29.] **The trial court erred in granting summary judgment to John Neu on PBC's breach of duty of loyalty claim.**

[¶ 30.] SDCL 60–2–13 sets forth the duty of loyalty one owes one's employer as determined by the South Dakota Legislature. It provides as follows:

An employee who has any business to transact on his own account, similar to that entrusted to him by his employer, must always give the latter the preference.

This Court addressed a similar issue in an earlier decision where the parties operated under an oral agreement with no mention as to duration or a noncompetition clause. *Bushman v. Pure Plant Food Intern. Ltd.*, 330 N.W.2d 762 (S.D.1983). In *Bushman*, the jury found there was a breach of the duty of loyalty, and this Court on appeal interpreted SDCL 60–2–13 to allow an employer to claim and prove up damages. *Id.* The Court held the statute did not prohibit employees from pursuing their own interests, but that it does require an employee to prioritize. *Id.* "An employee must prefer his employer's business interests to his own." *Id.* at 764.[5]

[¶ 31.] PBC alleges John Neu breached this duty of loyalty by preparing to compete with and competing with PBC while John was still under their employ. The trial court held there were no genuine issues of material fact on this claim and granted summary judgment. When the facts are viewed in a light most favorably to the nonmoving party, PBC, this Court is unable to reach the same conclusion as the court below. The trial court is not to decide the issues of fact, just determine if any such issues exist. *Wilson v. Great Northern Railway Company*, 83 S.D. 207, 157 N.W.2d 19 (S.D.1968).

[¶ 32.] PBC's claim focused on the facts as outlined in the affidavit of Doug Rose and the deposition of John Neu, which it claims show that John was taking several steps to compete with PBC while he was

(2) Other civil remedies that are not based upon misappropriation of a trade secret; or
(3) Criminal remedies, whether or not based upon misappropriation of a trade secret.

5. *cf.* Restatement (Second) of Agency, § 395 (breach of confidence while employed).
Unless otherwise agreed, an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency or in violation of his duties as agent, in competition with or to the injury of the principal, on his own account or on behalf of another, although such information does not relate to the transaction in which he is then employed, unless the information is a matter of general knowledge.

employed there. Rose alleged that John told his father about suppliers and equipment which were used by PBC while he was still under its employ. Rose alleges James then used that information to purchase equipment and investigate suppliers and products prior to John's termination at PBC. He further asserts that Neu Realty received a faxed certificate of analysis from Shell Chemical, manufacturer of epoxies, on April 6, 1995, and a fax from Dextar Aerospace in May 1995; both alleged to be suppliers of PBC that John revealed to his father. Rose averred and James Neu admitted in his deposition that in spring of 1995 (before John's termination) he purchased a paper-jogger and Franklin Hot–Stamp Machine, similar machines used by PBC in making their parts brushes.

[¶ 33.] This cause of action is not displaced by the SDUTSA. Under the common law [6] and SDCL 60–2–13, this duty is an implied term in every employment contract. The remedy sought by PBC in this suit, however, sounds in a tort theory. PBC is not seeking damages based on the contract of employment, those reasonably within the contemplation of the defendant when the contract was made; instead, they are seeking damages as a result of a violation of a duty. *See* Prosser, *Handbook on the Law of Torts* § 92, at 613 (4th ed. 1971). As such, this is a tort remedy. SDUTSA displaces "conflicting tort" remedies,[7] but this claim does not fall within that category. SDUTSA allows "civil remedies that are not based upon misappropriation of a trade secret." SDCL 37–29–7(b)(2). There is no doubt that there can be a breach of a duty of loyalty in the employment context without a misappropriation of a trade secret being involved.

[¶ 34.] Whether or not this duty was breached is a question of fact. Viewing the facts in the record in a light most favorably to PBC, there exist genuine issues of material fact; thus, summary judgment was improper.

[¶ 35.] **The trial court erred in granting summary judgment to the Neus on PBC's breach of contract claim.**

[¶ 36.] SDCL 53–1–2 sets forth the essential elements of a contract. It provides as follows:

> Elements essential to existence of a contract are:
>
> (1) Parties capable of contracting;
>
> (2) Their consent;
>
> (3) A lawful object; and
>
> (4) Sufficient cause or consideration.

[¶ 37.] As the trial court granted summary judgment on this claim merely stating there were no genuine issues of material fact, we are left to ascertain if any such facts exist when viewed in a light most favorably to PBC, the nonmoving party. "Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions, together with any affidavits, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *City of Lennox v. Mitek Industries, Inc.*, 519 N.W.2d 330, 332 (S.D.1994) (quoting *Breen v. Dakota Gear & Joint Co., Inc.*, 433 N.W.2d 221, 223 (S.D.1988)). We must factually assume all facts asserted by PBC are true and only uphold the summary judgment in the absence of a genuine issue of material fact. *See Estate of Shuck v. Perkins County*, 1998 SD 32, 577 N.W.2d 584.

---

6. *See Tlapek v. Chevron Oil Company*, 407 F.2d 1129 (8th Cir.1969) (settled law that implied terms of employment contract require employee to hold as sacred any trade secret or other confidential information which is acquired in course of employment).

7. The UTSA displaces tort remedies that conflict with the act, such as the common law action for the misappropriation of a trade secret. *Micro Display Systems, Inc., v. Axtel, Inc.*, 699 F.Supp. 202 (D.Minn.1988).

[¶ 38.] PBC claims defendants breached express and implied promises of confidentiality.[8] According to Rose, a contract or contracts did exist regarding the confidential disclosure of financial statements and the purchase of the business by James Neu. Rose testified in his deposition that the sale price was set at seven times the amount PBC earned in 1994. Since the year-end 1994 numbers were not to be available until the spring of 1995, the sale was to commence once the numbers were completed. He also testified that James had asked if John could intern with or work for PBC to learn the business prior to the commencement of the sale. Rose claims when he hired John in January 1995, it was under the assumption that this was part of the agreement. During Rose's deposition, he was asked if there was an agreement to purchase.

Q: So you never really had an agreement that he was going to buy it?

A: We had an agreement, he had agreed to buy the company, and I took he and his son John out to the plant, called the people together, and said I wanted to introduce the people to Mr. Neu and his son John, Mr. Neu is to be the soon owner of this company and John is coming with us ahead of time for familiarization.

(Rose deposition, 163:4–11).

[¶ 39.] The SDUTSA expressly states the chapter has no effect on contractual remedies. As such, this claim is not displaced under the provisions of that act. Therefore, we find that genuine issues of material fact exist regarding the existence of a contract and whether or not such alleged contract was breached. Accordingly, summary judgment was improperly granted.

[¶ 40.] **The trial court erred in granting summary judgment to PBC on Walton Brush's defamation claim.**

■ [¶ 41.] For more than two decades in South Dakota and most other jurisdictions, the question as to whether or not a defamation claim is actionable has been based on a distinction of whether the allegedly defamatory statement is "fact" or "opinion." If such statement was determined to be opinion, it was absolutely protected under the First Amendment of the United States Constitution. *See Gertz v. Welch*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Because some speech is constitutionally protected we must address that privilege prior to analyzing the statements under South Dakota's statutory scheme.

[¶ 42.] The constitutional "opinion" privilege emerged from the following dictum in *Gertz* :

Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

*Gertz*, 418 U.S. at 339–340, 94 S.Ct. at 3007, 41 L.Ed.2d at 805 (footnote omitted). This judicially created "fact" versus "opinion" dichotomy, which afforded First–Amendment–based protection for defamatory statements which are opinion, evolved when numerous state and federal courts began to interpret *Gertz*. As a result, it has been a question of law for the trial court to determine if a statement is fact or opinion using a four-factor test. This test was adopted by the Eighth Circuit Court of Appeals in *Janklow v. Newsweek, Inc.*, 788 F.2d 1300 (8th Cir.1986), and subsequently used by the South Dakota Su-

---

8. "Defendants knowingly and/or negligently have used and/or disclosed confidential, nonpublic information and trade secrets regarding Paint Brush's manufacturing process." (Complaint, p. 9).

"Defendants breached their obligation to act in good faith toward Plaintiff in the above-described particulars with the intent to cause sufficient financial hardship to Paint Brush." *Id.*

preme Court. *Janklow v. Viking Press,* 459 N.W.2d 415 (S.D.1990). Most courts, including ours, apparently understood the *Gertz* passage to mean "opinions" (not just ideas) are absolutely protected by the First Amendment of the United States Constitution.[9] *See Janklow v. Viking Press,* 459 N.W.2d at 423 (citing *Gertz,* 418 U.S. at 339–340, 94 S.Ct. at 3007, 41 L.Ed.2d at 805) (opinion is protected even if it may be false).

[¶ 43.] The United States Supreme Court has now clarified its *Gertz* holding, declaring that not all opinions are constitutionally protected. *Milkovich,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1. In *Milkovich,* the Court held the oft-cited passage from dictum in *Gertz* was not "intended to create a wholesale defamation exemption for anything that might be labeled opinion." *Milkovich,* 497 U.S. at 18, 110 S.Ct. at 2705, 111 L.Ed.2d at 17. "Not only would such an interpretation be contrary to the tenor and context of the passage, but it would also ignore the fact that expressions of 'opinion' may often imply an assertion of objective fact." *Id.*

[¶ 44.] In *Milkovich,* the Court further explained its rationale as to implied assertions of fact as follows:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.' " [citations omitted]. It is worthy of note that at common law, even the privilege of fair comment did not extend to "a false statement of fact, whether it was expressly stated or implied from an expression of opinion." Restatement (Second) of Torts, § 566, Comment a (1977).

*Milkovich,* 497 U.S. at 18–19, 110 S.Ct. at 2705–06, 111 L.Ed.2d at 17–18.

[¶ 45.] After *Milkovich,* commentators and courts started to change their focus from the fact/opinion analysis to one of searching for objectively verifiable facts.[10] Many of the United States Courts of Appeals have changed their examination of "opinion," from the "four factor test," to

---

**9.** Judge Friendly appropriately observed that this passage "has become the opening salvo in all arguments for protection from defamation actions on the ground of opinion, even though the case did not remotely concern the question." *Cianci v. New Times Pub. Co.,* 639 F.2d 54, 61 (C.A.2 1980). Read in context, though, the fair meaning of the passage is to equate the word "opinion" in the second sentence with the word "idea" in the first sentence. Under this view, the language was merely a reiteration of Justice Holmes' classic "marketplace of ideas" concept. *See Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (dissenting opinion) ("[T]he ultimate good desired is better reached by free trade in ideas ... the best test of truth is the power of the thought to get itself accepted in the competition of the market"). *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18, 110 S.Ct. 2695, 2705, 111 L.Ed.2d 1, 17 (1990).

**10.** Chief Judge Posner has captured the distinction between statements that are actionable and those that are not:
> A statement of fact is not shielded from an action for defamation by being prefaced with the words 'in my opinion,' but if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.

*Levinsky's, Inc., v. Wal–Mart Stores, Inc.,* 127 F.3d 122, 127 (1st Cir.1997) (quoting *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1227 (7th Cir.1993)).

one of determining if the opinion contains an objectively verifiable assertion.[11] "A statement couched as an opinion that presents or implies the existence of facts which are capable of being proven true or false can be actionable." *Levinsky's, Inc.*, 127 F.3d at 127 (citing *Milkovich*, 497 U.S. at 18, 110 S.Ct. at 2705). The old dichotomy and the new analysis, per *Milkovich*, was recently described as follows:

> Until a few years ago, we drew a sharp, formalistic line between fact and opinion, holding that anything cast in the form of an opinion was absolutely protected by the First Amendment and could not serve as the basis for a defamation claim. *See, e.g., Ault v. Hustler Magazine, Inc.*, 860 F.2d 877, 880–81 (9th Cir.1988), *cert denied*, 489 U.S. 1080, 109 S.Ct. 1532, 103 L.Ed.2d 837 (1989).
>
> In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), however, the Supreme Court rejected the bright-line approach of this and other circuits. It found the opinion/fact dichotomy too simplistic. The Court stated that it had never intended "to create a wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich*, 497 U.S. at 18, 110 S.Ct. at 2705. The Court reasoned that "[s]imply couching such statements in terms of opinion does not dispel [the false, defamatory] implications" because a speaker may still imply "a knowledge of facts which lead to the [defamatory] conclusion." *Id.* at 19, 110 S.Ct. at 2706. It therefore held that, while "pure" opinions are protected by the First Amendment, a statement that

"may ... imply a false assertion of fact" is actionable. *Id.* at 19, 110 S.Ct. at 2706.

*Partington v. Bugliosi*, 56 F.3d 1147, 1152, 1153 (9th Cir.1995).[12]

[¶ 46.] As a result of *Milkovich*, we now overrule *Janklow v. Viking Press*, 459 N.W.2d 415 and the cases which followed it, to the extent those cases are inconsistent with *Milkovich*.

■■■■■ [¶ 47.] We must now proceed with the understanding that there is no additional constitutional privilege for a broad category labeled "opinion." "[E]xpressions of opinion may often imply assertions of objective fact," and those statements are actionable. *Milkovich*, 497 U.S. at 18, 110 S.Ct. at 2705, 111 L.Ed.2d at 17. The dispositive question in the present case then becomes whether a reasonable factfinder could conclude that the statements in the warning letter imply a false assertion of objective fact with regard to Walton Brush. *Milkovich*, 497 U.S. at 21, 110 S.Ct. at 2707, 111 L.Ed.2d at 19.

■■■■■ [¶ 48.] The trial court held there were no genuine issues of material fact as to this issue and granted summary judgment to PBC, dismissing Walton Brush's claim. The basis of Walton Brush's claim of defamation is the letter that PBC sent to some of its customers after it learned of Walton Brush's manufacturing of parts brushes.[13] We must view all evidence in a light most favorably to Walton Brush, the nonmoving party, and reasonable doubts should be resolved against PBC. *Lamp v. First Nat. Bank of Garretson*, 496 N.W.2d

11. *See generally, Beverly Hills Foodland, Inc., v. Union*, 39 F.3d 191 (8th Cir.1994) (statements in the form of opinion do not enjoy absolute protection); *Levinsky's*, 127 F.3d at 127 (the First Amendment does not inoculate opinions against the ravages of defamation suits); *Milsap v. Journal/Sentinel, Inc.*, 100 F.3d 1265 (7th Cir.1996) (there is no wholesale defamation exemption for anything labeled opinion as it may imply an assertion of objective fact); *Washington v. Smith*, 80 F.3d 555, 317 U.S.App.D.C. 79 (D.C.Cir.1996) ("there is no categorical First Amendment

immunity against defamation suits for statements of opinion").

12. "Pure" opinions are those that "do not imply facts capable of being proved true or false." *Id.* (citing *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir.1990), *cert. denied*, 499 U.S. 961, 111 S.Ct. 1586, 113 L.Ed.2d 650 (1991)).

13. The letter is reprinted in footnote 1 above.

581 (S.D.1993). During our summary judgment analysis, we may consider the pleadings, depositions, answers to interrogatories, and admissions, together with any affidavits, to determine if any genuine issue of material fact exists and if the moving party was entitled to judgment as a matter of law. *City of Lennox v. Mitek Industries, Inc.*, 519 N.W.2d 330.

■■■ [¶ 49.] Among other statements, the letter declares that Walton appears to have "lifted" their advertising copy from PBC's advertising material. The letter also states PBC believes what is being done is "flagrantly deceptive." A reasonable factfinder could conclude that such statements imply a false assertion of objective fact. It implies that PBC has knowledge of facts which lead to a conclusion that Walton Brush is deceptive, dishonest, or some other equivalent. Walton Brush claims its products were made out to be inferior by PBC's remarks about the quality of the filaments used by PBC. "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Milkovich*, 497 U.S. at 18–19, 110 S.Ct. at 2705–06, 111 L.Ed.2d at 18.

■■■ [¶ 50.] A statement is actionable if it implies a false assertion of objective fact. *Id.* Whether a statement implies such is a question for the jury. *See Lundell Mfg. v. American Broadcasting Companies*, 98 F.3d 351 (8th Cir.1996) (the Court in *Milkovich* would not have used the reasonable factfinder language had it believed it must independently decide whether a statement was a false assertion of fact).

[¶ 51.] Once it is determined that the statement is actionable under the constitutional analysis, it is necessary to evaluate the statements under South Dakota's statutory scheme on defamation. Defamation is either libel or slander. SDCL 20–11–2. Libel is defined as follows:

Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.

SDCL 20–11–3.

■■■ [¶ 52.] "If a communication is privileged, it cannot constitute defamation and is not actionable." *Petersen v. Dacy*, 550 N.W.2d 91, 92 (S.D.1996) (citing *Peterson v. City of Mitchell*, 499 N.W.2d 911, 915 (S.D.1993)). In a cause of action for defamation, privilege may be raised as a defense. *Sparagon v. Native American Publishers, Inc.*, 1996 SD 3, ¶ 25, 542 N.W.2d 125, 132. A privileged communication is statutorily defined by SDCL 20–11–5(3), which provides:

A privileged communication is one made: in a communication, without malice, to a person interested therein, by one who is also interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information[.]

When reviewing appeals brought under SDCL 20–11–5(3), our first line of inquiry is whether the communication involved was between interested individuals. *Petersen v. Dacy*, 1996 SD 72 at 7, 550 N.W.2d at 93 (citing *Peterson v. City of Mitchell*, 499 N.W.2d at 915.).

The test for determining whether a communication is privileged under SDCL 20–11–5(3) involves an inquiry into the individuals or circumstances involved. *Peterson*, 499 N.W.2d at 915–16 (citing *Uken v. Sloat*, 296 N.W.2d 540, 542–43 (S.D.1980)). " 'An infallible test in determining whether a communication ... is or is not privileged is to ask whether, if true, it is a matter of proper public interest in relation to that with which it is sought to associate it.' " *Id.* (quoting

*McLean v. Merriman,* 42 S.D. 394, 399, 175 N.W. 878, 880 (1920)).

*Kieser v. Southeast Properties,* 1997 SD 87, 14, 566 N.W.2d 833, 837. We have also cited the Restatement (Second) of Torts with approval in determining whether the communication was made to an interested person:

An occasion makes a publication conditionally privileged if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know.

*Id.* (quoting *Restatement (Second) of Torts* § 596 (1986)). *See also Sparagon v. Native American Publishers, Inc.,* 1996 SD at 27, 542 N.W.2d at 132, *Tibke v. McDougall,* 479 N.W.2d 898, 905 (S.D.1992).

[¶ 53.] Since the common interest privilege is a conditional or qualified privilege, it must be determined if the communication was made with malice, which negates the privilege. *Peterson,* 499 N.W.2d at 916 (citing *Tibke,* 479 N.W.2d 898 and *Mackintosh v. Carter,* 451 N.W.2d 285 (S.D.1990)).

Because malice may not be inferred under the statute, there must be a specific showing of malice which requires proof of reckless disregard for the truth or actual malice. " 'The real test of whether a defendant's conduct is reckless so as to constitute actual malice is whether he in fact entertained serious doubts as to the truth of his publications.' " *Tibke,* 479 N.W.2d at 906 (quoting *Uken,* 296 N.W.2d at 543). " 'Reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.' " *Janklow v. Viking Press,* 459 N.W.2d 415, 419 (S.D.1990) (quoting *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968)). This Court has long held that the plaintiff has the burden of proving

actual malice that destroys the privilege. (citations omitted).

*Petersen v. Dacy,* 1996 SD at 8, 550 N.W.2d at 93.

[¶ 54.] The facts of this case are not entirely clear as there is some dispute over who received the letter. PBC claims it sent the letter to its customers while Walton Brush argues it has never received the list of those that received the letter. As such, Walton Brush argues the trial court could not properly make a determination as to whether the persons to whom the publication were sent were interested or not. We agree.

[¶ 55.] The existence of the privilege is a question of law. *Sparagon,* 1996 SD 3, 542 N.W.2d 125. "[T]he trial judge must determine if the communication is made to an interested person by an interested person or by a person who stands in relation to the interested person." *Id.* at 27, 542 N.W.2d at 132. (citing SDCL 20–11–5(3)).

[¶ 56.] Walton Brush asserts PBC intended for its customers to believe that Walton Brush was inferior and that Rose intended for PBC's customers to not buy Walton products as a result of the letter. Whether actual malice exists is also a question of law and fully reviewable by this court at the appropriate time. *Sparagon,* 1996 SD at 29, 542 N.W.2d at 132.

[¶ 57.] We are unable to determine if the trial court ruled on the issues of common interest privilege and malice, and as such, both questions remain for the trial court to decide on remand. In addition, genuine issues of material fact exist as to whether the letter is actionable under the constitutional analysis as it may imply a false assertion of fact. Thus, we conclude that the trial court improperly granted summary judgment as to the defamation claim.

[¶ 58.] PBC also asserts the defense of competition privilege to Walton Brush's defamation claim. This privilege, which is outlined in the Restatement (Second) of Torts § 649. which states:

A competitor is conditionally privileged to make an unduly favorable comparison of the quality of his own land, chattels or other things, with the quality of the competing land, chattels or other things of a rival competitor, although he does not believe that his own things are superior to those of the rival competitor, if the comparison does not contain false assertions of specific unfavorable facts regarding the rival competitor's things.

We can not determine if, or how, the trial court dealt with this issue. Upon completion of all discovery, the trial court should consider whether or not this conditional privilege applies under the facts of this case.

**[¶ 59.] The trial court erred in granting summary judgment to PBC on Walton Brush's disparagement and tortious interference with business relationships or expectancy claims.**

 [¶ 60.] The essential elements to prove disparagement are as follows:

Liability for Publication of Injurious Falsehood—General Principle.

One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if:

(a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and

(b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

*Gregory's, Inc. v. Haan*, 1996 SD 35, 12, 545 N.W.2d 488, 493 (quoting Restatement (Second) of Torts, § 623A (1977)).

 [¶ 61.] The elements necessary to prove tortious interference with business relationships or expectancy as established by our case law are:

(1) the existence of a valid business relationship or expectancy;

(2) knowledge by the interferer of the relationship or expectancy;

(3) an intentional and unjustified act of interference on the part of the interferer;

(4) proof that the interference caused the harm sustained; and

(5) damage to the party whose relationship or expectancy was disrupted.

*Hayes v. Northern Hills General Hosp.,* 1999 SD 28, 18, 590 N.W.2d 243, 248.

[¶ 62.] The warning letter sent by PBC is the basis of these two counterclaims by Walton Brush. Again, we do not know exactly who received the letters as that has not been disclosed. As this is a review of a grant of summary judgment by the trial court, the evidence must be viewed in a light most favorably to Walton Brush, the nonmoving party. Walton Brush asserts, inter alia, that PBC intended to cause harm by the letter, that PBC had knowledge regarding the falsity of its statements, and that such statements were made with reckless disregard. There are facts in the record to support these allegations when the evidence is viewed in a light most favorably to Walton Brush. Accepting as true the evidence presented by the nonmoving party, one can conclude that PBC intended to cause harm by this letter and that it knew some of the statements were false or that its employees acted in reckless disregard of the truth. Walton Brush's motion to compel discovery to learn the names of those that received the letter was never ruled on by the trial court. The trial court is instructed to grant the motion on remand. After discovery is complete, the parties deserve an opportunity to investigate the claim more thoroughly.

[¶ 63.] As to both of these counterclaims, PBC again claims the defense of competition privilege. As we can not determine if the trial court considered the applicability of this privilege to these claims, we direct the trial court so on remand. We find genuine issues of material fact exist regarding these two claims. Accordingly,

summary judgment was improperly granted.

## CONCLUSION

[¶ 64.] Neus moved pursuant to SDCL 37–29–4 for attorney's fees and application for taxation of costs and disbursements,[14] which motion was denied. If the motion had merit at the time it was made, and we do not think that it did, such merit was eliminated by our reversal of the summary judgment. The trial court is affirmed as to its denial of Neus' motion for attorney's fees and application for taxation of costs and disbursements.

[¶ 65.] We affirm, in part, and reverse and remand in part for further proceedings consistent with this opinion.

[¶ 66.] MILLER, Chief Justice, and AMUNDSON, KONENKAMP, and GILBERTSON, Justices, concur.

[¶ 67.] JOHNSON, Circuit Judge for SABERS, Justice, disqualified.

---

14. SDCL 37–29–4. Attorney's fees.
 If (i) a claim of misappropriation is made in bad faith, (ii) a motion to terminate an injunction is made or resisted in bad faith, or (iii) willful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party.