# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-4243

_____

Earl Long,

          Appellant,

          v.

Area Manager, Bureau of Reclamation;
United States Department of the
Interior; United States of America;
Secretary of the South Dakota
Department of Game, Fish, and Parks;
and State of South Dakota,

          Appellees.

Appeal from the United States
District Court for the District of
South Dakota.

_____

Submitted: November 13, 2000

Filed: January 4, 2001

_____

Before MORRIS SHEPPARD ARNOLD and JOHN R. GIBSON, Circuit Judges, and GOLDBERG,[1] Judge.

_____

_____

[1]The Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Earl Long owns property near the Angostura Reservoir, which is located south of Hot Springs, South Dakota. The land used to create the reservoir and an adjoining park was condemned by the federal government in 1949 and subsequently leased to the state of South Dakota. The reservoir and park are just west and south of Mr. Long's property (see map attached to this opinion).

Mr. Long sued under 28 U.S.C. § 2409a(a) to quiet title to a right of access to his property through the southern half of the park. Mr. Long also claimed that the defendants, various state and federal officials and entities, were estopped from denying him the access that he sought. The district court[2] granted summary judgment to the defendants, holding that the statute of limitations under the Quiet Title Act, *see* 28 U.S.C. § 2409a, *see also* 28 U.S.C. § 1346(f), barred the action and that estoppel was not available against the defendants. We affirm.

I.

Mr. Long first contends that he is entitled to gain access to his property through the southern half of the park because this means of access was not taken during the 1949 condemnation. Until 1949, access to the property from the south could be gained by using Lithia Road, a county road running north and south along the eastern edge of the property. Lithia Road also intersected County Road 1B near the northeast corner of the property, thus allowing access to the property from the north and east.

Following the 1949 condemnation, part of Lithia Road became submerged beneath the reservoir, curtailing the southern access to Mr. Long's property. The remainder of Lithia Road remained a public road and was frequently used to reach the

_____

[2]The Honorable Richard H. Battey, United States District Judge for the District of South Dakota.

-2-

park from County Road 1B.  Lithia Road was also used to travel between the northern and southern halves of the park, a use made possible by Lander's Easement (granted to the state in 1956), which allowed access from Lithia Road to the northern half of the park.

In 1973, at the state's request and with Mr. Long's consent, Fall River County vacated all of Lithia Road.  As part of that action, the county created a dead end and turnaround at the west end of County Road 1B (point A on the map), thus eliminating access to Lithia Road, as well as to Mr. Long's property, from County Road 1B.  Park users continued to use Lithia Road to travel between the northern and southern halves of the park.

After 1973, Mr. Long contends, the only way for him to gain access to his property was from the south.  He would use the park road in the southern half of the park and then head north to his property on Lithia Road or, later, on the realigned road created to the east of Lithia Road.  Lithia Road itself was blocked at the park boundary by a locked gate (point B on the map) following the creation of the realigned road, leaving the realigned road as Mr. Long's sole means of southern access to his property.  In 1988, however, the state placed a fence across the realigned road at the park boundary (point C on the map).  According to Mr. Long, this action left his property landlocked.

The defendants contend that Mr. Long can still gain access to his property from the north either by a road directly north of his property or by a public easement near the turnaround on County Road 1B (point A), and from the south by using the locked gate (to which he would be given a key) on Lithia Road (point B).  Mr. Long denies the usefulness of any of these routes.  In view of our resolution of this case, however, we believe that it is unnecessary to determine which of these contentions is correct.

II.

Mr. Long maintains that his right to use Lithia Road to gain access to his property from the southern half of the park was never taken during the 1949 condemnation, and he now seeks to quiet title to that right. Before we may reach the merits of his claim, however, we must determine whether the applicable limitations period has expired, as the defendants argue. The Quiet Title Act provides for a twelve-year limitations period, running from the time that the plaintiff or his predecessor-in-interest "knew or should have known" of the government's claim to the property. *See* 28 U.S.C. § 2409a(g). In determining when the limitations period began to run, we look to when Mr. Long or his predecessors should have had "a reasonable awareness that the government claims some interest adverse to [their own]," *State of North Dakota v. Block*, 789 F.2d 1308, 1312-14 (8th Cir. 1986).

The defendants contend that the limitations period expired in 1961, twelve years after the property was condemned, while Mr. Long contends that it did not begin to run until 1988, when the state completely prevented him from gaining access to his property. We believe that both the condemnation action itself and the facts surrounding it should have given Mr. Long's predecessor-in-interest, a party to the condemnation proceedings, a reasonable awareness in 1949 of the government's claim.

The federal government condemned the land used to create the Angostura Reservoir pursuant to a declaration of taking. *See* 40 U.S.C. 258a. Under that statute, once the declaration of taking is filed and money for compensation is deposited in the appropriate court, the title to the condemned property immediately vests in the government. Furthermore, unless the declaration of taking states otherwise, and here it did not, the taking is considered to be in fee simple absolute. *See id.* As a result, once the government completed the procedural steps required, it owned the condemned property at issue here in fee simple absolute.

The condemnation, as one in fee simple absolute, resulted in the termination of the Lithia Road easement. "Ordinarily an unqualified taking in fee by eminent domain takes all interests ... the accurate view would seem to be that such an exercise of eminent domain founds a new title and extinguishes all previous rights," *A. W. Duckett and Company, Inc. v. United States*, 266 U.S. 149, 151 (1924). No qualifications were placed upon the taking in this case, and thus the condemnation proceeding took all previous rights and interests, including the right to use Lithia Road. *See Holdridge v. United States*, 282 F.2d 302, 307 (8th Cir. 1960). The condemnation created a new title with the federal government holding an absolute fee interest in the property free of nonpossessory encumbrances.

Mr. Long's reliance on *Patterson v. Buffalo National River*, 76 F.3d 221 (8th Cir. 1996), is misplaced. In that case, *see id.* at 224, we faced the question of whether a landowner who deeded property to the government retained a right to cross the deeded property on the only road to the landowner's remaining property. In that situation, we determined that the deed did not place the landowner on notice of the government's claim of a right to block access to his property, and thus that the statute of limitations under the Quiet Title Act did not begin to run until the government restricted use of the road. *Id.* The special circumstances of *Patterson*, however, are not present here, because the declaration of taking clearly stated that the taking was in fee simple absolute.

Mr. Long also maintains that the federal government did not validly condemn the county's interest in Lithia Road because the county was not joined in the condemnation proceeding as the holder of that interest. Even if the county received improper notice of the condemnation proceeding, however, that fact would not affect the government's absolute ownership of the condemned land. In *United States v. Herring*, 750 F.2d 669, 671-72 (8th Cir. 1984), we determined that "[a]fter providing for the taking and then for compensation, it appears clear that the [Declaration of] Taking Act vests title in the government prior to any requirement to notify the owner of his right to compensation."

Because the government immediately receives title, a landowner who is improperly notified of a condemnation proceeding under the Declaration of Taking Act, *see* 40 U.S.C. § 258a through § 258e-1, retains only the right to receive just compensation, and has no right to challenge the condemnation itself. *See Herring*, 750 F.2d at 674. As the present declaration of taking appears to have been properly filed, title to all interests in the relevant land vested in the government immediately, regardless of the notice given to the county. The county's right in Lithia Road was therefore lost as soon as the declaration of taking was filed.

Mr. Long correctly notes that a taking that on its face is in fee simple absolute may leave a residual interest untaken when that interest is "clearly inferable," *Holdridge*, 282 F.2d at 307. He asserts that either the government's failure to assert dominion over the road immediately or the continued use of Lithia Road created such an interest and prevented him and his predecessors from discovering the government's claim until 1988. We do not believe, however, that the government needed to do more to make its interest in the property clear. The condemned property, including Lithia Road, was to be included within a park, and, indeed, some of the road was to be flooded. In these circumstances, the defendants' intent to exercise complete control over the road seems more than apparent.

Mr. Long directs our attention to *Burdess v. United States*, 553 F. Supp. 646 (E.D. Ark. 1982), and *United States v. Watson*, 80 F. Supp. 649 (E.D. Va. 1948). Both of these cases involved situations in which a condemnation left other property completely landlocked except for a road passing over the condemned property, and the courts concluded that the government could not have intended to leave the landowners completely landlocked. Even if we were to conclude that these cases were correctly decided, the principle for which they stand is of no avail to Mr. Long. Because he could gain access to his property from the north via County Road 1B, his property was not left landlocked by the condemnation. It is not, therefore, "clearly inferable,"

*Holdridge*, 282 F.2d at 307, that the government intended that public right to use Lithia Road within the park would survive the condemnation.

Nor does the continued public use of Lithia Road after the condemnation indicate a clearly inferable public right to use Lithia Road within the park. The portion of Lithia Road transversing Mr. Long's property remained a public road until at least 1973, and the public use of a public road to gain access to the park is entirely unremarkable and creates no inference whatever that the portion of the road within the park was open for public use.

Mr. Long's assertion that Lander's Easement indicated a continuing right to use Lithia Road within the park is equally untenable, as that easement was simply used to travel between the northern and southern halves of the park. That easement is entirely consistent with the government's right to limit the use of Lithia Road within the park, and thus no right to use any road within the park may be clearly inferred from the existence of Lander's Easement. We therefore cannot find that it is "clearly inferable," *id.*, that any public right to use Lithia Road within the park survived the 1949 condemnation. Because Mr. Long's predecessor-in-interest was a party to the condemnation, and was aware that the land in question was to be taken in fee simple absolute with no residual interests remaining, we hold that the condemnation placed Mr. Long's predecessor-in-interest on reasonable notice in 1949 of the government's claim.

The circumstances surrounding the condemnation also support the conclusion that Mr. Long's predecessor-in-interest should have known of the government's claim in 1949. It was readily apparent at that time that the future use of Lithia Road would be curtailed, as a portion of the road was soon to be flooded by the reservoir and included within the park. Had the park road not later been built, the condemnation would have resulted in a complete lack of southern access to Mr. Long's property. While Mr. Long's use of Lithia Road to gain access to his property was not actually

denied until 1988, the government's right to deny access was reasonably clear to his predecessor-in-interest in 1949. Because that awareness arose in 1949, the limitations period began to run at that time. Since Mr. Long did not file the current action until 1997, we hold that it is time-barred.

## III.

Even if we were to find that Mr. Long's quiet title action is not barred by the statute of limitations, moreover, it would fail because he does not claim a property interest to which title may be quieted. What Mr. Long seeks in this case is an undifferentiated right to use what was once a public road.

Under the Quiet Title Act, *see* 28 U.S.C. § 2409a(d), a plaintiff is required to state "the nature of the right ... or interest" that is asserted in the property. We agree with the Tenth Circuit that the right of an individual to use a public road is not a right or interest in property for purposes of the Quiet Title Act. *See Kinscherff v. United States*, 586 F.2d 159, 160 (10th Cir. 1978) (*per curiam*). The proper plaintiff to challenge the condemnation of a public road is the governmental entity that owns the easement. *Id.* at 160-61. Mr. Long thus fails to state a claim for which relief may be granted under the Quiet Title Act. *See* Fed. R. Civ. P. 12(b)(6). We therefore hold that the district court correctly granted summary judgment to the defendants on Mr. Long's quiet title action.

## IV.

Mr. Long also contends that even if his quiet title action fails, the defendants are estopped from denying him access to his property. Mr. Long's primary basis for this claim is a promise that he alleges state officials made to him in 1973, a time when state park officials wanted to close Lithia Road in order to prevent unauthorized access to either half of the park. To gain his acquiescence to the closing plan, which would have eliminated access to his property from the north, Mr. Long claims that the state officials assured him that he would always have access to his property from the south, *i.e.*,

through the park. In 1988, however, in response to litigation with a third party seeking to use the park roads to gain access to a proposed housing development, *see Wolff v. Secretary of South Dakota Game, Fish, and Parks Department*, 544 N.W.2d 531 (S.D. 1996), the park placed a locked gate at the Lithia Road entrance to the park, which prevented Mr. Long's access as well.

Mr. Long maintains that the 1973 promise by the state officials now estops the defendants from blocking his access to his property. The district court granted summary judgment on this issue, holding, we believe correctly, that state officials could not alter the property rights of the federal government. We agree with the district court that promises made by state officials cannot estop the federal government from asserting its fee simple title in the property. Estoppel cannot lie against the federal government without a showing of affirmative misconduct on its part, *see Conforti v. United States*, 74 F.3d 838, 841 (8th Cir. 1996), *cert. denied*, 519 U.S. 807 (1996), and Mr. Long points to no federal conduct that led him to believe that he would have continued access to his property. He instead maintains that the state acted as the federal government's agent in operating Angostura and that the acts of the state officials should therefore be imputed to the federal government.

Far from creating an agency relationship, however, the memorandum of understanding that sets forth the agreement between the state and the federal government for Angostura's operation specifically disclaims the state's ability to incur any obligation on behalf of the federal government. The memorandum simply gives the state a leasehold on Angostura, and while the state is of course free to grant licenses to use its leasehold, no authority is given for the state to grant a permanent right of access over the federal government's fee. Because the state had no authority to alter federal property interests, any pledge that it made to Mr. Long cannot bind the federal government. We hold therefore that the federal government is not estopped from denying Mr. Long access over its fee after the termination of the leasehold.

V.

While the state of South Dakota may not deprive the federal government of its property interests, the state is of course free to alter its own rights in its leasehold interest in Angostura. The question of whether the state may be estopped from denying Mr. Long a license to access his property while the park is in the state's possession was left unanswered by the district court. Because the eleventh amendment prevents us from asserting subject-matter jurisdiction over the estoppel claims against the state defendants, however, those claims must fail. While the district court did not address the issue of eleventh amendment immunity, a question of subject-matter jurisdiction may be raised *sua sponte* at any time. *See Fromm v. Commission of Veterans Affairs*, 220 F.3d 887, 890 (8th Cir. 2000).

The Supreme Court has interpreted the eleventh amendment to mean that "federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States,'" *Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996), quoting *Hans v. Louisiana*, 134 U.S. 1, 15 (1890). A state can of course waive its eleventh amendment immunity, *see Entergy, Arkansas, Inc. v. Nebraska*, 210 F.3d 887, 896 (8th Cir. 2000), and Mr. Long maintains that S.D. Codified Laws Ann. § 21-32-8, § 21-36-24, which allow the state to be sued in South Dakota state court as a party to property disputes, constitute such a waiver. These statutes are, however, insufficient to constitute a waiver of eleventh amendment immunity because a state does not submit to federal jurisdiction merely by consenting to suit in its own courts. *See Smith v. Reeves*, 178 U.S. 436, 441 (1900); *see also Entergy*, 210 F.3d at 897. Since the state of South Dakota has not consented to this lawsuit, the eleventh amendment prevents us from asserting jurisdiction over a claim against the state.

Along with the state itself, however, Mr. Long has also sued the Secretary of the South Dakota Department of Game, Fish, and Parks, and under *Ex parte Young*, 209 U.S. 123, 155-56, 159, 167 (1908), injunctive relief is generally available against state

-10-

officials for continuing violations of federal law. *See Entergy*, 210 F.3d at 897. Mr. Long's only claimed violation of federal law seems to be that the state, by preventing him from gaining access to his property, has rendered that property worthless in violation of his fourteenth amendment right not to have his property taken without just compensation.

It is true that under certain circumstances a state action that denies a landowner all use of his property may constitute an informal taking that requires just compensation to be paid. *See First English Evangelical Lutheran Church v. Los Angeles County, California*, 482 U.S. 304, 321-22 (1987). Even if we were to find that a taking occurred in Mr. Long's case, however, we could not grant an injunction against the state official. "Equitable relief is not available to enjoin an alleged taking of private property ... when a suit for compensation can be brought against the sovereign subsequent to the taking," *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984). Since Mr. Long may bring a common-law action for damages against the state for depriving him of his right of access, *see Hurley v. South Dakota*, 143 N.W.2d 722, 729 (S.D. 1966), equitable relief in our court is unavailable to him.

VI.

Finally, even if we were to hold that Mr. Long's estoppel claim could proceed against the state or its officials, the claim would fail on its merits. Like most courts, the South Dakota Supreme Court has taken a dim view of the possibility of an estoppel operating against a government, allowing it only in "extreme cases," *Even v. City of Parker*, 597 N.W.2d 670, 674 (S.D. 1999). We have previously recognized that South Dakota case law indicates that "for equitable estoppel to apply to a public entity, that entity or its employees must have engaged in fraud," *Bell v. Fowler*, 99 F.3d 262, 267 (8th Cir. 1996); *see also Erickson v. County of Brookings*, 541 N.W.2d 734, 737 (S.D. 1996) (*per curiam*), and *Smith v. Neville*, 539 N.W.2d 679, 682 (S.D. 1995). A fraudulent statement is one that is known to be untrue when it is made or one that is

made with reckless disregard for its truth. *See Paint Brush Corp. v. Neu*, 599 N.W.2d 384, 391 (S.D. 1999).

Mr. Long asserts that the park officials concealed their eventual intent to block access to his land when they promised him perpetual access to it through the southern half of the park. This assertion, however, is completely unsupported by the record. By all accounts, the state fulfilled any promise that it made to allow access to Mr. Long's property for fifteen years after Mr. Long alleges that the promise was made. The state even cooperated with Mr. Long in realigning the road into the southern half of the park at the same time that he now contends that the state was planning to block off the road entirely. It was only in light of the *Wolff* litigation, which threatened to change the use of the park roads completely by opening them up as access roads to a housing development, that the state backed away from its promise.

Mr. Long presents no evidence tending to show that the state made a promise that it did not fully and reasonably intend to keep, and therefore he cannot show any fraud. Without evidence of fraud, this case simply does not rise to the level of egregiousness that is required to make out an estoppel against the state. We therefore hold that the district court correctly granted summary judgment to the defendants on this issue.

## VII.

For the foregoing reasons, we affirm the judgment of the district court.



A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.